587 So.2d 823 (1991)
Cheryl Ann Cortez POLLOCK, Plaintiff-Appellee,
v.
LOUISIANA INSURANCE GUARANTY ASSOCIATION, Defendant-Appellant.
No. 90-263.
Court of Appeal of Louisiana, Third Circuit.
October 2, 1991.
*824 Wm. Goforth, Lafayette, for plaintiff/appellee.
Dauzat, Falgoust, Caviness, Bienvenu & Stipe, Peter F. Caviness, Opelousas, for defendant/appellant.
Before GUIDRY, YELVERTON and KNOLL, JJ.
KNOLL, Judge.
Louisiana Insurance Guaranty Association (LIGA) and its insured, Nursing Home of Eunice, Inc. (Nursing Home), appeal the judgment of the trial court, finding Cheryl Ann Cortez Pollock entitled to worker's compensation for temporary total disability as well as penalties, and $5,000 attorney's fees.
LIGA and the Nursing Home contend that: (1) the trial court was manifestly erroneous in finding Pollock disabled by *825 the 1984 work accident; alternatively, (2) the trial court erred in awarding Pollock benefits for temporary total disability instead of supplemental earnings benefits; (3) the trial court erred in awarding penalties and attorney's fees; and, (4) the trial court erred in failing to grant their exception of prematurity.

FACTS
On October 9, 1984, Pollock was employed by the Nursing Home as a licensed practical nurse. On that date she allegedly injured her neck, shoulders and back when she attempted to lift a patient who had fallen and become wedged between a commode and the wall.
Pollock initially consulted Dr. James McDaniel, an orthopedic surgeon, shortly after her accident. After approximately three months under Dr. McDaniel's care, Pollock began treatment under Dr. Donald Harper, a neurologist. As of the time of trial in 1989, Pollock was still under the care of Dr. Harper.
We note that on November 2, 1986, Pollock was involved in an accident unrelated to work. On that date she tripped and fell in a hole near a sidewalk in Church Point, breaking her ankle and injuring her back. Although LIGA and the Nursing Home do not contend the second accident was the cause of Pollock's continued disability, they used discovery testimony taken in that suit to impeach Pollock's testimony in the case sub judice. Therefore this second accident is factually significant to that extent.
Pollock was paid worker's compensation benefits of $208.43 per week from October 9, 1984, to March 30, 1987. At the request of the Office of Worker's Compensation, Dr. Fred Webre, an orthopedic surgeon, examined Pollock on March 11, 1987. Based on Dr. Webre's medical report issued shortly after his examination, LIGA and the Nursing Home terminated Pollock's worker's compensation benefits. This litigation then commenced within one year of the termination of benefits.

DISABILITY
LIGA and the Nursing Home contend that the trial court erred in finding that Pollock was disabled as a result of the October 9, 1984, accident. They argue that the trial court's finding of disability was clearly wrong because Pollock's testimony was contradictory and not believable.
The finding of disability within the framework of the worker's compensation law is a legal rather than purely medical determination. Manson v. City of Shreveport, 577 So.2d 1167 (La.App. 2nd Cir. 1991). Therefore the question of disability must be determined by reference to the totality of the evidence, including both lay and medical testimony. Id.
Ultimately, the question of disability is a question of fact. Latiolais v. Home Ins. Co., 454 So.2d 902 (La.App. 3rd Cir. 1984), writ denied, 460 So.2d 610 (La.1984). Accordingly, an appellate court may not set aside a trial court's findings of fact in the absence of manifest error or unless clearly wrong. Therefore reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal. Rosell v. ESCO, 549 So.2d 840 (La.1989). Such deference to the findings of a trial court with regard to facts and credibility apply to worker's compensation cases. Ducote v. J.A. Jones Const. Co., 471 So.2d 704 (La.1985).
LIGA and the Nursing Home focused their attention at trial on Pollock's credibility as their main attack on the finding of disability.
On November 2, 1986, two years after Pollock's work accident, she was involved in a trip-fall accident in the town of Church Point. At Pollock's workers compensation trial, LIGA and the Nursing Home confronted her with her discovery testimony in the Church Point law suit in which she states that she had not sued LIGA and the Nursing Home, and that her back injury at the Nursing Home took two years to resolve. They further brought out Pollock's depositional testimony, again in the Church Point action, in which she stated that at the time of her trip-fall in Church Point in *826 November of 1986, that her back was pain free and was not bothering her. Based on these statements, they contend that Pollock's trial testimony on her worker's compensation claim was impeached.
When confronted with these statements, Pollock explained that she was pain free at the time of her fall in Church Point only because she was under medication. In addition, the following rehabilitative colloquy occurred between Pollock and her attorney:
"[Counsel for Pollock]
Q.... [W]here Mr. Caviness [Counsel for LIGA and the Nursing Home] referred to earlier, implying that you were pain-free,did you at any time, ... tell Mr. Caviness that you were in fact pain free?
* * * * * *
A. Says Iwhere it says `were you free of pain', it [the deposition] says `I don't know'.
Q. Well
A. On my answer.
Q. You were taking
A. I know I haven't been going to therapy, is what I responded.
Q. All right. Did you understand the questions that were being asked of you at that time?
A. Not to mean the same thing what he's [Mr. Caviness] sayingno.
* * * * * *
Q.... [Where] here ... [the interrogatory] says, `the type of injury and how long it took for the injury to resolve', and it says, `back injurytwo years'. Would you explain what you meant by `back injurytwo years'?
A. What I meant wasI had been paid by workmen's comp for two years for the back injury that I received at the Nursing Home.
Q. Andwhat did you take the word `resolve' to mean?
A. Means them stop paying me.
Q.... Now you understand what settlement is?
* * * * * *
A. Yeah. I took this to mean that when they sent that paper from the Commission thing [Office of Worker's Compensation], that they were to pay me $208 and somewhat cents a week
* * * * * *
Q.... Were you taking any type of medication when you gave this deposition?
* * * * * *
A. I was taking, for sure, the percodan,I don't know if I was taking the prozac(?) or what, because he's [Dr. Harper] changed my medications so many different times. I've taken, you knowtons that he's tried to get, so that it would help my back.
Q. Does this medication have any effect on your ability to think?
A. Oh, of course it does."
It cannot be denied as we review the trial record that LIGA and the Nursing Home raised serious questions regarding Pollock's truthfulness about her pain and the duration thereof. Nevertheless, even though the trial court did not comment on Pollock's credibility, it found the medical evidence convincing corroborative proof of Pollock's disability.
In its written reasons for judgment, the learned trial court examined the medical testimony and detailed its analysis which supports its findings of disability. We adopt and set forth herein these reasons as our own in affirming the finding of disability:

"Plaintiff's Doctor
Dr. Harper (Neurologist, Addictionologist, Psychopharmacologist)
A doctor with these qualifications should know what he is talking about. He is the present treating physician.

After falling out with Dr. McDaniels (whose testimony will be discussed later), she passed into the hands of Dr. Harper, who has been her treating physician since January of 1985, and has been treating her to date.
His opinion is that she has muscle strain in the shoulder area (myalgis), and that she has a pre-existing condition commonly *827 known as `double jointed', which to the Court's surprise, instead of being helpful, is detrimental to the plaintiff's condition, as the muscle and ligament support is lax, and could possibly lend the plaintiff to easier injury. He also felt she had a bulging disc at L-5, which is also suggestive of a problem. He thinks she would work in pain, and can only perform in a structured job.
On cross-examination he receded from back or neck disc problems, but maintained his position as to his diagnosis of shoulder area muscle problem,as of this late date. He still attributes that problem to the accident, irrespective of the ankle injury, when she stepped in the hole in 1986.
Defense counsel carefully elicited an observation that the doctor believes she may have an emotional overlay, and then receded from that area,implying that her problem is mental,to discount the physical problem; but, attempting to avoid a finding of a traumatic neurosis.
In November of 1986, the doctor and plaintiff discussed possible employment,but not that of an LPN.
We turn now to the defendant's doctors. Again, we characterize them as such, when in reality they should be witnesses totally removed professionally, and should be `experts'.
Defendant's Doctors
a. Dr. Webre (Othopedist) [sicl
He examined her for social security benefits in May of 1985, and turned her down. His attention was to the lower back, and said her problem `may have been a strain of the back'.
He saw her in March of 1987, at the request of the office of Worker's Compensation, about the 1984 worker's compensation injury, `I had the impression that it was still there'. Her complaints were to the lower back, and she was still limping from the ankle injury. He thought she could go back to work as an LPN.
He saw her again in May of 1988, at the request of the plaintiff, after a caesarean. He `couldn't account for her continuing complaints'. He `thought she could go back to work'. Again, he concentrated on the low back. He did not review the other doctors' reports.
Note pages 34 and 35 of his deposition
Q. Doctor, your opinion in this doesn't mean that Ms. Cortez is not experiencing pain, is it?
A. No. It means that I can't explain the reason she's having her pain.
Q. Doctor, if while she performs activity such as the duties that would be required of an LPN in a nursing home and she experiences pain upon the performance of those activities, would you have any recommendation as to limitations of those activities?
A. That depends on what she'd present as at the time when sheif I were treating her and she'sI'd sent her back to work and she'd complain of pain, then I'd have to reexamine and see just what she's complaining of.
His clearance was on the basis of no objective findings.
b. Dr. Heard (Board Orthopedic Surgeon)
He saw plaintiff January 4, 1985.
Page 9 of his deposition:
A. It appeared that she had a reported normal myelogram. It appeared that the symptoms were on the basis of a strain in the neck, mid back, and low back area and additional testing was recommended.
She could return to light duty work.
In June of 1986, a CAT scan was normal. There was a bulge in the five point area.
He thought she could go to work.
He recommended over the counter drugs and an exercise program.
He said she could go back to work; then, he hedges. See page 15 of his deposition:
A. She still had symptoms of pain, you know, from the injury and the symptoms had not resolved, but there was no objective evidence on her exam or *828 her diagnostic test to restrict her any further. It had been some year and a half since her injury, and this was felt to be a sufficient amount of time of restriction.
Note page 17:
Q. O.K. Thank you. No objective signs of orthopedic injury. Is that your way of saying to Acadiana Claim Service that I can't determine what is causing this lady's pain and based on my inability to determine what is causing her pain, I would release her to return to work because I can't see anything?
A. It's really on the basis of when an individual hurts, either the neck or the low back area, there's three general areas you have to look at. You have to see if there is an injury to the bones, second, is there an injury to the discs or the nerves, or third, is there an injury to the soft tissues. And when people have an injury to the soft tissues, this is a very disabling problem for people, and the average person or the usual person or 80 percent of the people are well in six weeks, 20 percent will have symptoms longer than a six weeks period and they will require longer restrictions. They will require medications for a longer period and they will require longer restrictions. They will require medications for a longer period of time, but at some point in time you canyou do not permanently restrict somebody because of a soft tissue injury or a strain. Surely not after one year. So I'm basically telling them that I don't find any evidence of bone injury, no evidence of disc or nerve injury, and she has continued symptoms but the symptoms and her findings are not severe enough that they should restrict her work activities.
But note page 26:
Q. You were not able to isolate the cause of Ms. Pollock's pain?
A. I was able to say it was probably on the basis of a strain in the muscles and the ligaments.
And, page 28:
Q. Doctor, isn't there a certain percentage of people who have painful back conditions who take even longer than one year or two years and sometimes even three years?
A. Well, there's some of them, they're going to have pain indefinitely.
c. Dr. McDaniel (Orthopedic Surgeon)
He first knew the plaintiff before 1980; and first treated her in August of 1980, as a result of a rear-end collision in 1979. She complained of pain in the neck and shoulders. After August, she saw someone else.
He next saw her on October 10, 1984, for the accident in question, with pains in the neck and shoulders. No symptoms in the lower back. While she held her neck rigidly, he said she had no spasm. (He kept repeating the lower back was clear.) He noted that diminished sensation in a finger was `questionable'. However, he `felt that it's possible she could have had a mild cervical thoracic strain'. (Page 9) He treated her with medicine and exercises. `There were no objective abnormalities' (Note: he treated her on `subjective' symptoms). He saw her late in October, and admitted her to the hospital (still on subjective complaints), and ran a myelogram on the lumbar and cervical regions, which showed nothing `of significance showed up'. However, still with no objective symptoms, he started her on physical therapy.
He saw her again on October 31, 1984, and began suspecting `emotional overlay', but no `significant injury pattern'. No `significant orthopedic injury'. He put her on exercise and cervical traction.
He then saw her on November 8, 1984. `Starting to improve, minimal complaints'. He gave her a tranquilizer.
The Therapist reported spasm, but he felt it was voluntary tightness. He kept her on exercise and therapy. He saw her December 5, 1984, `much better'. Light work, no heavy lifting.
He then saw her in December of 1985. Considered a workup of psychological and neurological evaluation. He felt she did not have an `orthopedic' problem.

*829 He saw her on January 7, 1985,put her in the hospital and had Dr. Cole do a psychological evaluation.
Note his observation at page 31:
So some of the other medical diseases, physical diseases that could have accounted for it just didn't come into play here so how do you go about explaining bizarre symptoms and moving about of symptoms in someone who initially presented with subjective complaints that could have been consistent with a legitimate strain and I think that theby far the most likely thing is some type of emotional response, whether it's malingering or whether it's hysterical, whether it's a combination of both, I really don't know definitively but I think it's in that area.
Also, his comment on page 32:
A. This is the type of person that I talked about earlier that you have to be careful with and overtreat. He felt that she was immature, narcissistic, self-indulgent, passive dependent and made excessive demands on others for attention and sympathy and, you know, I think that when you have someone of that sort they start presenting with physical complaints that don't make sense, that lack true physical findings, then you need to consider the motives. What is the secondary gain factors in this particular person, you know; certainly I did not get into that. I became aware that this was coming into play very soon in the offset. That's why I wanted to avoid the passive dependency with the therapist and with me and putting more of the burden on her.
The conclusion that the Court gets from this doctor is that objectively he can find no basis for orthopedic complaints and since there are no objective symptoms, he feels she can go back to work. However, he feels, confirmed by Dr. Cole, (whose deposition strangely was never taken) that she has a psychological overlay."
After carefully examining Pollock's testimony and the medical evidence, giving deference to our role as an appellate court, we cannot say that the trial court was manifestly wrong in its conclusion that Pollock proved that she suffered a medical disability under the framework of the worker's compensation laws.
However, for reasons which follow, we conclude that the trial court erred in finding Pollock temporarily totally disabled.
In Breaux v. Travelers Ins. Co., 526 So.2d 284, 289 (La.App. 3rd Cir.1988), we stated:
"In Anderson, [v. Aetna Casualty and Surety Company] [505 So.2d 199 (La. App. 3rd Cir.1987), writ denied, 511 So.2d 1152 (La.1987) ], we reversed the trial court's finding of temporarytotal disability, stating:
`It is clear from the evidence before us that the plaintiff is no longer able to engage in employment requiring heavy manual labor.... However, the plaintiff has failed to prove that he cannot engage in any self-employment or gainful occupation for wages, except for the fact that he lacks certain skills or training. We do not believe that plaintiff is entitled to a determination of temporary total disability simply because of a lack of training or education to perform some other job. In that respect, we disagree with the trial court and find that its determination of temporary total disability was clearly wrong.'
The court went on to note that, while the odd lot doctrine is available to a temporarily and totally disabled employee (see Thomas v. Elder Pallett and Lumber Sales, Inc., [493 So.2d 1267 (La.App. 3rd Cir.1986), writ denied, 497 So.2d 312 (La. 1986) ], where the court afforded odd-lot classification to a worker which the court found `was in a recovery period' and who would `most likely recover within a forseeable period of time'), it does not apply in cases where the employee's condition is permanent not temporary."
In the case sub judice, Dr. Harper, Pollock's treating physician, testified on the permanency of her condition. Dr. Harper opined that "[he] hoped her condition *830 would improve in the future", but because of her chronic problem, "the prognosis is fair to poor in terms of long-term improvement." Finally, toward the end of his testimony, Dr. Harper was asked, "Doctor, more than likely is her condition going to be a permanent one?". He responded, "Yes. I believe I've already stated that more likely than not it will persist." Considering the totality of Dr. Harper's testimony in light of our earlier judicial pronouncements in Breaux and Anderson, we find that the trial court erred in awarding Pollock benefits for temporary total disability. Instead, the totality of the medical testimony convinces us that Pollock is entitled to Supplemental Earnings Benefits as provided in LSA-R.S. 23:1221(3), since her disability is not temporary, and the consensus of the medical evidence, including that offered by Dr. Harper, supports the conclusion that plaintiff is able to engage in self-employment or other gainful occupation albeit different from that in which she was engaged at the time of injury.

PENALTIES & ATTORNEY'S FEES
LIGA and the Nursing Home contend that the trial court erred in awarding Pollock statutory penalties and attorney's fees.
The law relative to the award of statutory penalties was set forth and thoroughly discussed in Breaux, supra, and will not be repeated herein. Suffice it to say that penalties are not awardable if the employer reasonably controverts the employee's right to benefits.
Similarly, in Chelette v. American Guarantee and Liability Insurance, Inc., 480 So.2d 363 (La.App. 3rd Cir.1985), we held that the arbitrary and capricious standard was still the correct manner for assessing the employee's claim for an award of attorney's fees.
The evidence in the case sub judice shows that LIGA paid worker's compensation benefits from October 9, 1984, to March 30, 1987, when it terminated weekly worker's compensation benefits because of the medical report provided by Dr. Webre. Nevertheless, LIGA continued paying medical expenses until May 24, 1988.
It is well settled that an employer and its worker's compensation carrier should not be penalized for seeking judicial resolution of close issues. Breaux, supra, and cases cited therein. In the present case, none of the physicians were able to find an objective reason for Pollock's continued pain, and all recommended that she was able to perform some work. When viewed in light of Pollock's depositional testimony in her 1986 trip-fall accident, unrelated to work, in which she stated that she was well from her work accident and was pain free, we find that LIGA and the Nursing Home had a reasonable basis for controverting Pollock's claim for further compensation and medical expenses. Accordingly, we do not find that penalties should be assessed. Likewise, based on these same facts, we cannot say that LIGA was arbitrary and capricious in terminating worker's compensation benefits and medical expenses.
Therefore we find the trial court erred in awarding penalties and attorney's fees.

PREMATURITY
LIGA and the Nursing Home contend that the trial court erred in failing to grant their dilatory exception of prematurity.
Prior to answer, LIGA and the Nursing Home filed an exception of prematurity to Pollock's petition for worker's compensation. They alleged that although the claim was first presented to the Louisiana Office of Worker's Compensation (LOWC) and a recommendation was made on April 2, 1985, the lawsuit Pollock filed in 1988 was not based on issues presented in 1985 to LOWC. The exception was not disposed of prior to trial, and was instead referred to the trial on the merits. Despite this procedure, the trial court did not address the exception in its written reasons and the judgment is silent on the disposition of the exception.
When a judgment is silent with regard to the disposition of matter, it is presumed that the trial court denied the exception. *831 Smith v. Hughes Wood Products, Inc., 544 So.2d 687 (La.App. 3rd Cir.1989).
LIGA and the Nursing Home contended that Pollock should have resubmitted her dispute with them to LOWC because the issues which ultimately led to her court action were not addressed when LOWC first issued its recommendation in 1985.
Assuming, for the moment, the correctness of LIGA and the Nursing Home's contention, we find no merit to their argument. As the moving parties, it was incumbent upon LIGA and the Nursing Home to introduce evidence that showed that the issue which precipitated the 1988 lawsuit was one which had not been presented to LOWC in 1985. Although the recommendation of LOWC issued in 1985 is in the record, it is silent with regard to the issues which provoked its recommendation. Likewise, there is no testimony in the record which illuminates the nature of the 1985 LOWC recommendation. Without evidence on this threshold issue, we are unable to assess the argument of LIGA and the Nursing Home. Therefore we find no error in the trial court's implied denial of the exception.
Accordingly, for the reasons stated hereinabove, the judgment of the trial court is affirmed in part, reversed in part, and recast as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of Cheryl Ann Cortez Pollock and against Louisiana Insurance Guaranty Association and Nursing Home of Eunice, Inc. for Supplemental Earnings Benefits, pursuant to LSA-R.S. 23:1221(3), commencing with March 11, 1988. All Supplemental Earnings Benefits payments past due on the date this judgment becomes final are to be paid in a lump sum, together with legal interest on all past due payments from due date of each installment until paid.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the dilatory exception of LIGA and Nursing Home of Eunice, Inc. is denied.
Costs of trial and appeal are assessed to LIGA and Nursing Home of Eunice, Inc.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.