637 So.2d 764 (1994)
Cotimea BROWN
v.
CHURCHILL & THIBAUT, INC.
No. 93 CA 1216.
Court of Appeal of Louisiana, First Circuit.
May 20, 1994.
*765 Anna E. Dow, Baton Rouge, for plaintiff-appellee Cotimea Ida Brown.
Robert C. Funderburk, Jr., Baton Rouge, for defendant-appellant Churchill & Thibaut, Inc.
Before CARTER, GONZALES and WHIPPLE, JJ.
CARTER, Judge.
This is an appeal in a worker's compensation case.

FACTS
On September 6, 1987, forty-one-year-old plaintiff Cotimea Brown (also known as Ida Mae Brown) was injured during the course and scope of her employment with Churchill & Thibaut, Inc. (Churchill) as a laborer on a plantation. On the date of the accident, Brown was planting sugarcane in the fields *766 of the plantation when she was hit in the back by a sugarcane cart being pulled by a tractor. As a result of the accident, Brown sustained back injuries.
Churchill's worker's compensation insurer at the time of Brown's accident was Rockwood Insurance Company (Rockwood). Rockwood paid Brown weekly compensation and medical benefits until September 1, 1990.[1] Rockwood discontinued Brown's compensation benefits at that time, but continued to pay her medical expenses. On May 14, 1991, Brown filed a claim for worker's compensation benefits with the Office of Workers' Compensation, alleging a continuing disability.[2] On July 26, 1991, Rockwood and Churchill answered Brown's petition and filed a dilatory exception raising the objection of vagueness.[3] On May 21, 1992, LIGA was substituted as a defendant for Rockwood, which had become insolvent.
On September 24, 1992, a hearing was held on Brown's worker's compensation claim. On October 12, 1992, the hearing officer signed a judgment in favor of Brown and against LIGA and Churchill, finding Brown to be temporarily totally disabled and ordering LIGA and Churchill to pay Brown all past due temporary total disability benefits in the amount of $98.50 per week from September 1, 1990, until September 24, 1992. The judgment also ordered that the benefits continue while Brown was disabled. LIGA and Churchill were cast for the costs of Dr. Murphy's deposition and the cost of the proceedings. LIGA and Churchill appealed from the judgment, assigning as error the hearing officer's determination that the September 6, 1987, accident caused Brown's alleged disability and that Brown was disabled beyond September 1, 1990.

CAUSATION
A worker's compensation claimant has the burden of proving his claim even though the Louisiana Worker's Compensation Act, LSA-R.S. 23:1021, et seq., is to be construed liberally in favor of the claimant. Bruno v. Harbert International Inc., 593 So.2d 357, 361 (La.1992). The claimant must establish his disability and causal relation with his employment accident by a preponderance of the evidence. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320, 324 (La.1985). Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. Patterson v. GNB Battery, Inc., 569 So.2d 640, 642 (La.App. 2nd Cir.1990), writ denied, 573 So.2d 1134 (La.1991). In order for the claimant to recover, it must be determined that his employment somehow caused or contributed to his disability, but it is not necessary that the exact cause be found. Walton v. Normandy Village Homes Association, Inc., 475 So.2d at 324.
Upon review, the hearing officer's findings will not be disturbed unless they are clearly wrong. Martin v. Riverview Medical Center, 618 So.2d 1014, 1017 (La.App. 1st Cir.), writ denied, 623 So.2d 1333 (La.1993). For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, the reviewing court must do more than simply review the record for some evidence which *767 supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882, 883.
In the instant case, Brown's testimony reveals that, at the time of the accident, she was forty-one years old and working ten to twelve hours per day as a laborer on a plantation. She indicated that, prior to the accident, she was not experiencing any back pain and noted that, if she had been suffering from any back problem, she would not have been able to do the work which she was doing. Brown testified that, prior to 1987, she had not consulted a physician about any "serious" back pain.
In his deposition, Dr. Earl Schexnayder, a general practitioner, stated that, on June 12, 1980, June 20, 1981, and September 23, 1983, Brown went to his office with complaints of back pain.[4] However, he indicated that she had experienced no trauma at the time. Dr. Schexnayder explained that, with regard to the September 23, 1983, complaints, Dr. Grant (an associate of Dr. Schexnayder), examined Brown and felt that she had sciatic nerve syndrome. However, Brown did not return to Dr. Grant or Dr. Schexnayder thereafter for treatment or with complaints of back pain until after the 1987 incident.
According to Dr. George Murphy, an orthopedic surgeon, it was more probable than not that Brown's symptoms and condition arose from the September 6, 1987, accident. He stated:
If she had an injury, a documented injury, and has had persistent follow-up and care ever since then, and there's no history of any other major injury or any history of routineroutine care for the period a year or so prior to that injury, then you would have to associate the problems that I've treated her for that injury and that is the only way I can say it.
When asked whether Dr. Grant's 1983 documented diagnosis of sciatic nerve syndrome (or sciatica) would change his opinion as to the cause of Brown's condition, Dr. Murphy stated that he would place no significance on the previous diagnosis because it had been documented four years prior to the 1987 injury. Dr. Murphy went on to explain that backaches are the most common thing for which people seek medical treatment and that most complaints usually turn out to be simple muscle strain. Dr. Murphy also stated that, assuming that Brown did have a preexisting back condition, clearly the 1987 accident would have aggravated the condition and made it symptomatic.
The defendants argue that Dr. Murphy was not in a position to provide a definite opinion as to the cause of Brown's condition because he did not begin treating her until approximately three and one-half years after the accident. However, it is clear that Dr. Murphy began treating Brown after Dr. Murphy's associate, Dr. Daniel Seltzer moved out of state. Thus, in reaching his conclusions, Dr. Murphy was provided with Dr. Schexnayder's medical records and was able to rely on them, as well as the medical history given by Brown, and his own objective findings as revealed in two EMG's, an MRI, a myelogran, a CT scan, and a discogram. The defendants also rely on Dr. Murphy's testimony that the rate of degeneration *768 in the disc in Brown's back is consistent with someone her age.
After hearing Brown's testimony and reviewing the depositions and medical records, the hearing officer determined that Brown had proved by a preponderance of the evidence that her back condition was causally related to her September 6, 1987, injury. After reviewing the record in its entirety, we conclude that the hearing officer was not manifestly erroneous in this finding.

DISABILITY
Temporary total disability benefits are addressed in LSA-R.S. 23:1221(1). By Act 454 of 1989, the statute was amended, heightening the burden of proof for a claimant seeking temporary total disability benefits. Prior to the 1989 amendments, the burden of proof in a claim for temporary total disability benefits was proof by a preponderance of the evidence. However, under the amended statute, the claimant must prove the nature and extent of his disability by clear and convincing evidence, unaided by any presumption of disability, that he is physically unable to engage in any employment or self-employment. Tanner v. International Maintenance Corporation, 602 So.2d 1133, 1137 (La.App. 1st Cir.1992).
Substantive laws either establish new rules, rights, and duties or change existing ones. Interpretive laws, on the other hand, do not create new rules, but merely establish the meaning that the interpretive statute had from the time of its enactment. St. Paul Fire & Marine Insurance Company v. Smith, 609 So.2d 809, 817 (La.1992). A statute which changes a well-settled line of jurisprudence relative to substantive rights only has prospective effect. St. Paul Fire & Marine Insurance Company v. Smith, 609 So.2d at 820. It is clear that the amendments to LSA-R.S. 23:1221(1) enacted a substantive change in the law to be applied prospectively only. Masters v. Scogin Auto Parts, Inc., 625 So.2d 319, 322 (La.App. 3rd Cir.1993), writ denied, 631 So.2d 450 (La. 1994). As such, the post-1990 version of the statute cannot be retroactively applied to an injury which occurred on September 6, 1987, and the applicable burden of proof is proof by a preponderance of the evidence.
The finding of disability within the framework of the worker's compensation law is a legal rather than a purely medical determination. Pollock v. Louisiana Insurance Guaranty Association, 587 So.2d 823, 825 (La.App. 3rd Cir.1991); Manson v. City of Shreveport, 577 So.2d 1167, 1169 (La.App. 2nd Cir.), writ denied, 580 So.2d 928 (La. 1991). Therefore, the question of disability must be determined by reference to the totality of the evidence, including both lay and medical testimony. Moore v. Mason & Dixon Tank Lines, 540 So.2d 525, 529 (La.App. 1st Cir.), writ denied, 541 So.2d 1390 (La. 1989). Ultimately the question of disability is a question of fact, which cannot be reversed in the absence of manifest error. See Landry v. Central Industries, Inc., 592 So.2d 478, 480 (La.App. 3rd Cir.1991), writ denied, 593 So.2d 381 (La.1992); Pollock v. Louisiana Insurance Guaranty Association, 587 So.2d at 825.
In the instant case, Brown testified that she dropped out of school in the sixth grade, but that she later obtained a high school equivalency diploma and attended one semester at Nicholls State University. Brown indicated that she had not received any special training and that she possessed no special skills. Brown stated that she had previously worked as a baby-sitter, a housekeeper, a cook, and a seamstress and had been employed in a fish market and a lounge before. Brown testified that, on the date of the accident, September 6, 1987, she was planting sugarcane and was hit in the back by a sugarcane cart.
The medical evidence in the record reveals that, on the day of the accident, Brown was treated in the emergency room at Prevost Memorial Hospital, where she was diagnosed with lumbar back pain and a lower back contusion. On the following day, Brown was treated by a Dr. Sternfels, who prescribed Percodan for her pain.
On September 11, 1987, Dr. Earl Schexnayder began treating Brown for the injuries she sustained on September 6, 1987. Dr. Schexnayder's deposition testimony reveals *769 that he diagnosed Brown with low back pain secondary to trauma, and, as a result of the diagnosis, he restricted her activities and recommended that she not return to work. Dr. Schexnayder continued to treat Brown for back pain and eventually referred her for physical therapy. Dr. Schexnayder then scheduled an appointment for Brown with an orthopedist, Dr. Sam Irwin. On October 6, 1987, Dr. Schexnayder saw Brown and discussed with her Dr. Irwin's report, which suggested that she remain in bed for two weeks and continue taking pain medication. Dr. Schexnayder indicated that, in late October of 1987, Dr. Irwin informed him that Brown either had a minimal ruptured disc or degenerative changes in the disc.
On October 28, 1987, Dr. Daniel Seltzer began treating Brown. His examination revealed a mild decrease in range of motion. On November 16, 1987, Dr. Seltzer again noted that Brown had a decreased range of motion and reported that x-rays showed a mild degenerative change in the lumbar spine and that a CT scan of the lumbar spine strongly suggested a disc herniation at the L5-S1 level. Dr. Seltzer continued to see Brown on an intermittent basis through June of 1988, but Brown's condition did not improve. On July 27, 1988, Dr. Seltzer noted that an MRI revealed discogenic disease, but that it did not reveal disc herniation. Brown's subsequent examinations by Dr. Seltzer (in September, October, November, and December of 1988, and January and February of 1989) showed no improvement of her condition. On March 1, 1989, Dr. Seltzer stated that Brown's prognosis was "guarded" and that she was still incapable of employment. On April 18, 1989, Dr. Seltzer noted that Brown's condition had deteriorated to the point that she was experiencing intractable pain. However, on June 8, 1989, Dr. Seltzer gave Brown a favorable prognosis and stated that he had no expectation of long-term or permanent partial disability.
Dr. Seltzer stated that Brown had reached maximum medical improvement as of May 16, 1989, and that she had no permanent disability. He indicated that Brown could return to light duty work, but that she was not to lift or carry more than fifteen pounds and was not to work in a stooped, crouched, or bent over position.
Despite Dr. Seltzer's finding that Brown had reached maximum medical improvement as of May 16, 1989, in January of 1990, Dr. John R. Clifford evaluated Brown, noting that an EMG showed "chronic denervation" and that a dermatomal sensory evoked response suggested an L3-4 radiculopathy.[5] Dr. Clifford noted his suspicions of symptom magnification and referred Brown to an associate, Dr. Thomas Patrick Perone, for a second opinion. Dr. Perone examined Brown and noted that he also suspected symptom magnification, but he, nonetheless, felt that she had a lumbar strain.
On March 5, 1990, Dr. Clifford stated that he had nothing further to offer Brown and that he felt she could be employed. On July 26, 1990, Dr. Clifford indicated that Brown could return to her former occupation, noting that Brown had complaints with no findings and no permanent partial disability.
However, the medical evidence in the record reveals that, even after Dr. Clifford discharged Brown, she continued to suffer with back pain and continued to be treated for her condition. On October 31, 1990, Brown returned to Dr. Seltzer, and he noted that her lumbar and thoracic spine showed a mild decrease in range of motion and that he felt that Brown had a chronic thoracic and lumbar strain. Dr. Seltzer continued to treat Brown and, on May 15, 1991, reported that Brown's condition remained unchanged.
On June 13, 1991, Dr. George Murphy began treating Brown.[6] On June 14, 1991, an EMG was performed, which revealed mild L4-5 radiculopathy in Brown's right leg. On June 20, 1991, an MRI indicated disc degeneration at the L2-3, L3-4, and L5-S1 levels and probable central herniation at L5-S1. Subsequent tests revealed that Brown was experiencing discogenic pain, but that she did *770 not have a ruptured disc. In September of 1991, Dr. Murphy recommended that Brown undergo surgical fusion, and he continued to see Brown at regular intervals. In March of 1992, an EMG revealed mild to moderate, chronic changes at the right L4-5 level. However, on April 7, 1992, Dr. Murphy determined that surgery could be limited to the L5-S1 level. On April 22, 1992, Brown underwent an instrumented fusion of the L5-S1 level, after which she was hospitalized for six days. On May 4, 1992, Brown returned to Dr. Murphy, and he noted that she seemed to be doing well.
Dr. Murphy last saw Brown on August 18, 1992. At that time, she had been undergoing physical therapy for approximately three weeks, and Dr. Murphy expected that she would require therapy for another few months. Dr. Murphy stated that it was unlikely that Brown would reach maximum medical improvement for at least twelve to eighteen months from the date of the surgery, depending on the success of the fusion. His prognosis was fairly good, but he noted that, even if Brown's fusion had been extremely successful, she would still have permanent restrictions with regard to lifting and bending. Dr. Murphy stated that he was not yet able to determine Brown's future disability because it depended upon the success of the fusion.
When asked whether Brown could be functional in a work situation, Dr. Murphy stated as follows:
Okay, from the time that I initially saw her, she would not have been suitable for an unlimited duty status at any time. And since theespecially since the surgery and at the present time, she would be on a complete no duty status whatsoever.

* * * * * *
In other words, from the time prior to [when] I saw her and up until the time that we had considered surgery, she would have been capable of some light duties that were very restricted. (Emphasis added.)
Brown testified that she has been in constant pain since the accident, but that she had, nonetheless, attempted to return to work. According to Brown, she had submitted several employment applications and had worked for approximately four hours at Terry's Candy Factory. However, Brown stated that she was unable to perform her duties at the candy factory due to the pain she experienced. Brown testified that she wished to return to some type of employment and that she would have returned to work with Churchill had they asked her to do so. Brown indicated that she had not received any vocational rehabilitation training from Churchill or any of the insurance companies involved in this case. Brown stated that, although her condition had improved since the surgery, she was still experiencing pain and was still under Dr. Murphy's care.
There is no doubt that the medical evidence is conflicting as to whether Brown was disabled beyond September 1, 1990. However, the hearing officer considered the conflicting evidence and made a determination that Brown was temporarily totally disabled. After thoroughly reviewing the entire record in this matter, we conclude that a reasonable basis exists for the hearing officer's determination. Therefore, the finding cannot be manifestly erroneous or clearly wrong. See Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.

CONCLUSION
For the reasons set forth above, the judgment rendered by the hearing officer is affirmed. Costs of the appeal are assessed against Churchill & Thibaut, Inc.[7]
AFFIRMED.
NOTES
[1] The record is unclear as to the date Rockwood began paying Brown compensation benefits. However, the record reveals that Brown reached a settlement with Churchill and Rockwood sometime in 1989. As a result of the settlement, Churchill and Rockwood paid Brown back compensation benefits and continued to pay Brown's compensation and medical benefits until September 1, 1990.
[2] Frank A. Bruno, an attorney who had previously represented Brown in a personal injury action, filed a motion to intervene in the proceedings for attorney's fees, and Brown answered the petition. However, the transcript of the September 24, 1992, hearing indicates that Bruno was not present. The hearing officer stated that he would search his records in order to determine whether Bruno had been notified of the hearing date.
[3] The record is void of any transcript of a hearing on the exception, and the record does not contain a judgment with regard to the exception.
[4] On June 12, 1980, Brown was seen by Dr. Schexnayder. On June 20, 1981, she was seen by Dr. Hirsch, an associate of Dr. Schexnayder. Also, on September 23, 1983, Brown was seen by another of Dr. Schexnayder's associates, Dr. Grant.
[5] Dr. Clifford had previously seen Brown in June, November, and December of 1989 for complaints of severe back and leg pain.
[6] Dr. Murphy explained in his deposition that he had been associated with Dr. Seltzer until Dr. Seltzer moved out of the state.
[7] In 1993, the legislature passed Act 651, effective August 15, 1993, amending and reenacting LSA-R.S. 13:4521(A), and Act 958, effective June 25, 1993, amending and reenacting LSA-R.S. 13:4521(A) and (B) and 13:5112(A) and (B). Both acts provide that LIGA shall not be required to pay court costs in any judicial proceeding by or against it.