|2CARTER, Judge.
This is an appeal from a judgment of the Office of Worker’s Compensation.

FACTS

On July 12, 1989, plaintiff, Delores Put-man, was injured during the course and scope of her employment as an Out Reach Worker 1 with Human Development Services (HDS) for the City of Baton Rouge. On the day of the accident, Putman walked out of her office carrying an armload of files and tripped over a chair, causing her to sustain *1252 injuries. As a result of her injuries, Putman missed approximately one week of work, but returned and continued to work until February 12, 1990. Commercial Union Insurance Company (Commercial Union), the worker’s compensation insurer for HDS, paid Putman worker’s compensation benefits through February 5, 1991.
On June 12, 1991, Putman filed a disputed claim for worker’s compensation benefits with the Office of Worker’s Compensation, contending that her benefits had been terminated prematurely and that she was entitled to partial permanent disability benefits and/or supplemental earnings benefits. Commercial Union and HDS contended that Putman was capable of working and earning 90% or more of her pre-injury wages and, thus, was not entitled to further compensation benefits.
On April 8, 1992, the matter was heard by a hearing officer. At the hearing, the parties stipulated that Putman had been injured during the course and scope of her employment on July 12, 1989, and that her average weekly wage was $258.25.
On October 27, 1992, the hearing officer rendered judgment, finding that Putman was entitled to temporary total disability benefits for the month of March, 1991, and supplemental earnings benefits from that time through the date of trial (April 8, 1992) and until Putman is physically able to earn 90% or more of her pre-injury earnings.
|3Commercial Union and HDS appealed from the judgment, assigning as error the hearing officer’s award of supplemental earnings benefits to Putman.

SUPPLEMENTAL EARNINGS BENEFITS

Supplemental earnings benefits (SEB) are addressed in LSA-R.S. 23:1221(3). Like all other provisions of the worker’s compensation law, the provisions governing SEB must be liberally construed in favor of coverage. Daigle v. Sherwin-Williams Company, 545 So.2d 1005,1006 (La.1989). The purpose of SEB is to compensate the injured employee for wage-earning capacity he has lost as a result of an accident. Pinkins v. Cardinal Wholesale Supply, Inc., 619 So.2d 52, 55 (La.1993). The threshold prerequisite to the recovery of SEB is that the employee’s injury results in his inability to earn wages equal to ninety percent or more of the wages he was earning at the time of the injury. Daigle v. Sherwin-Williams Company, 545 So.2d at 1006-07. Thus, the injured employee bears the burden of proving by a preponderance of the evidence that his work-related injury resulted in his inability to earn that amount. Paul v. Gipson, 614 So.2d 1275, 1278 (La.App. 2nd Cir.1993); Moore v. Mason & Dixon Tank Lines, 540 So.2d 525, 528 (La.App. 1st Cir.), writ denied, 541 So.2d 1390 (La.1989).
In determining if an injured employee has made out a prima facie case of entitlement to SEB, the trial court may and should take into account all those factors which might bear on an employee’s ability to earn a wage. Daigle v. Sherwin-Williams Company, 545 So.2d at 1007. The mere fact that the plaintiff has been released to return to work does not automatically disqualify him from receiving SEB. Dyer v. GAB Business Services, 613 So.2d 801, 804 (La.App. 4th Cir.), writ denied, 617 So.2d 939 (La.1993).
Once the employee establishes a pri-ma facie case of entitlement to SEB, the burden shifts to the employer to show that the employee is physically able to perform a certain job and that |4the job was offered to the employee or was available to the employee in his or the employee’s community or reasonable geographic area. Daigle v. Sherwin-Williams Company, 545 So.2d at 1008-09. If the employer meets this burden, then the employee must show by clear and convincing evidence, unaided by any presumption of disability, that he is unable to perform the employment offered or available solely as a consequence of substantial pain. LSA-R.S. 23:1221(3)(c)(ii); Paul v. Gipson, 614 So.2d at 1278.
For an appellate court to reverse a trial court’s factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Stobart v. State, *1253 Department of Transportation and Development, 617 So.2d 880, 882 (La.1993); Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882.
The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Moreover, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882-83. However, where the documents or objective evidence so contradict the witness’s story or the story itself is so internally inconsistent or implausible on its face |5that a reasonable factfinder would not credit the witness’s story, an appellate court may find manifest error or clear wrongness even in a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).
Such deference to the findings of a trial court with regard to facts and credibility also applies to worker’s compensation cases. Pollock v. Louisiana Insurance Guaranty Association, 587 So.2d 823, 825 (La.App. 3rd Cir.1991); Stewart v. Ormond Country Club, 542 So.2d 658, 659-60 (La.App. 5th Cir.), writ denied, 544 So.2d 408 (La.1989). See Ducote v. J.A. Jones Construction Company, 471 So.2d 704, 706 (La.1985); Martin v. Riverview Medical Center, 618 So.2d 1014, 1017 (La.App. 1st Cir.), writ denied, 623 So.2d 1333 (La.1993).
In the instant case, Putman testified that, on July 12,1989, she was employed as an Out Reach Worker 1 by HDS. Her duties were clerical in nature and included filing, making copies of documents, answering the telephone, and writing letters. Putman stated that, on the day of the accident, she walked out of her office carrying an armload of files and tripped over a chair, causing her to fall and sustain injuries.
As a result of her injuries, Putman was treated by several physicians. She was initially treated by her family physician, Dr. Donald Batie, who prescribed bed rest and analgesics and, thereafter, referred her for physical therapy. Dr. Batie subsequently referred Putman to Dr. Johnny Jenkins, an orthopedic surgeon. Dr. Jenkins treated Putman and advised her that she was a candidate for surgery. Dr. Jenkins then referred Putman to Dr. John Clifford.
Dr. John Clifford testified by deposition that he began treating Putman on January 29, 1990, for complaints of low back pain and right leg pain. After reviewing Putman’s CT scan results, Dr. Clifford found a transitional segment in the lumbosacral interspace with a central and right-sided disc rupture with some calcification. Dr. Clifford opined that Putman’s problems resulted |6from the lower disc bulge. Although Dr. Clifford felt that the bulge resulted from a degenerative process, he indicated that it most likely was made symptomatic by the fall. On February 12, 1990, Dr. Clifford advised Putman not to return to work and suggested that she begin out-patient autotraction and physical therapy. Dr. Clifford continued treating Putman, and, in July of 1990, he recommended that she receive epidural steroid injections for treatment of her back pain. Dr. Luther Stewart administered two epidural injections to Putman and monitored her improvement thereafter. He testified that Putman showed some improvement after the injections, but that she suffered from chronic pain syndrome and depression.
On September 12, 1990, Dr. Clifford found that Putman had improved and released her for light duty work with the restriction that she refrain from heavy lifting. However, on September 13, 1990, Putman experienced a *1254 resurgence of her symptoms and returned to Dr. Clifford who continued treating her until November 19, 1990. At that time, Dr. Clifford noted that Putman had complaints without supportive findings and felt that she had reached maximum medical improvement. Dr. Clifford then advised Putman to obtain a second opinion.[1]
On December 14, 1990, Dr. John Thomas, orthopedic surgeon, performed an independent medical examination of Putman. Dr. Thomas’s impression was that Putman suffered a sprain of the lumbar spine. He noted that it was possible that the slow resolution of Putman’s symptoms was related to the preexisting segmentation defect in her lower lumbar spine, but he felt that her back problems were made symptomatic by the fall. Dr. Thomas did not feel that Putman was a candidate for surgical intervention and encouraged her to return to work with the restriction that she refrain from lifting. Dr. Thomas saw Putman only on this one occasion.
|7In late January of 1991, Terry Ardoin, a rehabilitation consultant, contacted Drs. Thomas and Clifford regarding Putman’s ability to return to her former employment. Both doctors were presented with a job analysis for Putman’s position as an Out Reach Worker 1. The job analysis indicated that Putman’s job required that she be able to lift and carry items weighing between two and five pounds, bend to remove copies from the copy machine, sit approximately seven and one-half hours, and stand for approximately thirty to thirty-five minutes.
After reviewing the job analysis, Dr. Thomas concluded that Putman could return to her former employment and verified this by signing a release. Dr. Clifford reviewed the job analysis and also felt that Putman could return to her former employment. He, therefore, signed the release attached to the job analysis, even though he had not examined Putman since November 19, 1990, nearly three months before. In response to the releases by Drs. Thomas and Clifford, Put-man’s worker’s compensation benefits were terminated on February 5, 1991.
In a letter dated March 11,1991, the Office of the Mayor-President advised Putman that she was to return to work on March 18,1991. However, at that time, Putman was still under the active care of a neurologist, Dr. Marvin Clifton. Dr. Clifton began seeing Putman on October 22, 1990, and his treatment of her included therapy, ultrasound, TENS treatments, and exercise. On March 18, 1991, Dr. Clifton examined Putman and opined that she would be able to return to light duty work with restrictions at the beginning of April of 1991. Dr. Clifton noted that Putman was not to perform “continuous bending, sitting or standing maneuvers,” was not to lift more than thirty pounds at one time, and was not to sit or stand for more than two hours consecutively. In a letter dated March 22, 1991, the Office of the May- or-President advised Putman of its receipt of medically excused absence confirmation from Dr. Clifton and advised her to contact L.E. “Skip” Breeden, Director |8of Health and Occupational Safety for the City of Baton Rouge, for further instructions.
Putman testified that she was informed by Larry Pitcher, Assistant Director of the Office of Employment and Training, that, before she could return to work, she would have to be examined by a city-designated physician.[2] Putman complied with the requirement and was examined by a Dr. Maurer at the Industrial Medical Center on June 14, 1991. Putman testified that, after the examination, Dr. Maurer did not inform her of his decision to release her. Moreover, Putman stated that, thereafter, she was not contacted by anyone from HDS regarding her return to work. Consequently, on June 24, 1991, Putman submitted a letter of resignation to HDS, stating that she resigned “in order to draw ... retirement money” so that her six-year-old child could “eat properly.”
*1255 Breeden testified that it is standard procedure to require injured employees to be examined by a city-designated physician prior to returning to their positions. According to Breeden, on the date of Putman’s examination, he received a telephone call from a nurse at the Industrial Medical Center, informing him that Putman was released to return to her previous employment. Thereafter, Breeden received a report, stating that Putman could resume work, but that she was not to lift more than ten pounds and was not to perform repetitive bending. According to Breeden, no one from his office notified Put-man of the physician’s release because it was his understanding that the physician normally informs the employee of the decision regarding her release. However, Breeden was uncertain as to whether the physician informed Putman during the visit of his decision to release her. Breeden explained that his office did not follow up on Putman’s return to work due to the receipt of Putman’s letter of resignation.
|9Putman testified that, since the accident, her life has changed physically, financially, and sexually. She indicated that she can no longer engage in the activities she once enjoyed, such as bowling, traveling, driving, and playing with her young child. Putman can no longer perform household chores, and she is required to wear a corset on a daily basis. Putman explained that she and her husband have a strained sexual relationship because intercourse is painful for her. Put-man testified that, since the accident, she has become very nervous because it is difficult to handle the pain and because she worries about her family. Putman stated that she was placed on Prozac because she was experiencing suicidal thoughts and indicated that her medication causes her to sleep frequently.[3]
Putman testified that, although she still experiences pain, she feels that she can work within the restrictions imposed upon her. Putman stated that, although she has attempted to obtain gainful employment by mailing resumes and by applying for a clerk’s job at a local store, she has been unsuccessful in obtaining employment.[4]
After considering Putman’s testimony as well as the medical testimony and medical records, the hearing officer found that, although Drs. Clifford and Thomas released Putman to return to work on February 5, 1991, she was still under the active care of Dr. Clifton, who did not release her until early April of 1991. The hearing officer concluded that Putman had proved by a preponderance of the evidence her entitlement to SEB, i.e., that her work-related injury resulted in her inability to earn wages equal to ninety percent or more of the wages she was earning at the time of the injury.
|10Once Putman made out a prima facie case for entitlement to SEB, the burden shifted to HDS and Commercial Union to prove that Putman is physically able to perform a particular job and that the job was either offered to Putman or was available in her or the employer’s community or reasonable geographic region. See Dyer v. GAB Business Services, 613 So.2d at 804. HDS and Commercial Union did not show that Putman is physically able to perform a particular job and that the job was either offered to her or was available in Putman’s or the employer’s community or reasonable geographic region.
Upon review, our function is not to determine whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. See Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though we may have reached a different result had we been sitting as the trier of fact in this case, we cannot disturb the factfin-der’s reasonable evaluations of credibility and reasonable inferences of fact where conflict exists in the testimony. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Moreover, where *1256 two permissible views of the evidence exist, the factfinder’s choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 883. After considering the entire record in this matter, we find that a reasonable basis exists for the findings of the hearing officer and that the findings are not clearly wrong. Therefore, the judgment of the hearing officer is affirmed.

CONCLUSION

For the foregoing reasons, the judgment of the hearing officer, awarding Putman SEB, is affirmed. Costs of the appeal in the amount of $1,547.72 are assessed against HDS and Commercial Union.
AFFIRMED.

. Dr. Clifford arranged for Putman to see a neurosurgeon, Dr. Hanchey, but Commercial Union did not approve his treatment.

. Larry Pitcher testified that Putman was required to see a city-dcsignated physician for a determination of whether her limitations would prohibit her from working in her previous position.

. In addition to Prozac, Putman takes Darvocet and Lortab for pain and Pamelor (sleeping pills).

. This type of evidence has been held to be sufficient to establish a prima facie case of entitlement to SEB. Dyer v. GAB Business Services, 613 So.2d 801, 804 (La.App. 4th Cir.), writ denied, 617 So.2d 939 (La.1993).