674 So.2d 478 (1996)
Cynthia MOORE
v.
SANDERSON FARMS, INC.
No. 95 CA 2042.
Court of Appeal of Louisiana, First Circuit.
May 10, 1996.
*480 Ivan David Warner, III, New Orleans, for Plaintiff-Appellee.
Christopher M. Moody, Hammond, for Defendant-Appellant.
Before LeBLANC, WHIPPLE and FOGG, JJ.
FOGG, Judge.
Defendant, Sanderson Farms, Inc., appeals a decision of a workers' compensation hearing officer finding that the claimant, Cynthia Moore, is entitled to supplemental earnings benefits, continued medical and rehabilitative treatment, psychological and/or psychiatric testing and treatment, and penalties and attorney's fees. We reverse.
Cynthia Moore, an employee of Sanderson Farms, was initially injured on January 2, 1994 when a piece of equipment she was working with broke and fell on her right hand. She visited the plant nurse who treated the injury with an ice wrap. Moore continued working on a daily basis, some days with an ice wrap supplied by the plant nurse. On or about January 26, 1994, she was again injured while she was hanging frozen chickens on a machine. At that time, she felt like something burst in her hand and she again went to the plant nurse.
The nurse originally sent Moore to Dr. Dunn, who practiced family and occupational medicine. Over the next several months, Moore was seen by several physicians and underwent many tests and procedures on her hand. She was released for full duty by three physicians; however, a fourth physician stated in his report that she could return to work with some restrictions. Liberty Mutual, who administered Sanderson Farms' claims, stopped all payments based on the findings of the first three physicians. Once the payments stopped, Moore reported for work; however, she did not have a release from her physician. She was told to return after obtaining a release. Although she did not call or write to request the release, once it came to her home, she reported to Sanderson Farms for work. By that time, several weeks has passed and she was told there was no position available.
Moore filed a disputed claim for compensation on September 11, 1994. The hearing was held on May 4, 1995. The hearing officer ruled that the claimant continued to be disabled due to her work related injuries and was unable to engage in any gainful employment earning at least ninety percent of her pre-injury wages. Therefore, she was entitled to supplemental earning benefits, based on a zero wage earning capacity, beginning June 10, 1994. The hearing officer also ruled that the claimant was entitled to continued medical treatment, rehabilitation, psychological and/or psychiatric testing and treatment by the psychologist or psychiatrist of her choice, and all medical costs and expenses. Additionally, she found Sanderson Farms was arbitrary and capricious in denying the claimant's request to see a physician of her choice and awarded the claimant attorney's fees of $450.00. She also found that the defendant was arbitrary and capricious in terminating the claimant's workers' compensation benefits, for which she awarded the claimant penalties in the sum of $2,000.00 and attorney's fees in the sum of $2,500.00. Sanderson Farms appeals this ruling.
On appeal, Sanderson Farms contends the hearing officer erred in finding the claimant is entitled to supplemental earnings benefits. Inasmuch as we find merit in that argument and reverse the judgment based on that issue, we pretermit consideration of *481 the other issues argued by appellant which relate to the termination of benefits.
Moore first saw Dr. Dunn on January 31, 1994, at which time he found that there was some spasm in her distal forearm. His impression was that she suffered from a wrist sprain. On her second visit, just two days later, he found no spasm, swelling, or discoloration. On the third visit, Dr. Dunn found nothing in Moore's condition that he could attribute to an accident or trauma other than her subjective complaints of pain. During the next visit he stated that, although he was concerned about the very slight possibility of a fracture, he could not explain the degree of pain that she was having, and she definitely seemed to be over-emphasizing her pain. It was at that time that he began to suspect that she was malingering. He did not stop his treatment at that time. He continued to try to find another explanation for her pain, including a bone scan which turned out to be normal. On her February 23, 1994 visit, she continued to complain of pain and sensitivity, but there was full range of motion with no soft tissue swelling. He stated that there were no palpable lesions on the back of her hand and the complaint seemed to be out of proportion to his previous findings. At that time, he suggested she return to work. During her visits, Dr. Dunn treated her with several different types of pain medications and injections. When he saw her on March 3, 1994, she again complained of severe pain with light touch on the back of her hand. Still he could find no objective findings. When asked at trial if he thought her complaints were suspicious, he answered "Yes." When questioned further about his impression, he stated:
A. Well, at that time when I initially examined her, she complained of severe pain when I touched her. So I distracted her by examining her shoulder with my other hand and palpated her hand and wrist both lightly and firmly. And at that time she seemed unaware that I was pressing her hand. And then when I stopped examining her shoulder with my other hand and again drew her attention to her hand, she began jumping and screaming and complaining about how tender it was. So at that time I was convinced that she was malingering.
Q. And that is a test that you do to detect malingering?
A. Right. It's just a matter of distracting her attention to a different area of the body. But I was still doing the same type of motion as before. And afterwards she complained of pain, which she didn't notice the pain when she thought I was examining her shoulder.
Finally, Dr. Dunn confronted Moore with his findings. That was his last visit with her.
Moore was also treated by Dr. Bankston, an orthopedic surgeon. On her first visit on February 24, 1994, Dr. Bankston found she had a very hypersensitive type pain in her hand which could fit the picture of a reflex sympathetic dystrophy (RSD). He took additional x-rays and reviewed the bone scan that was done by Dr. Dunn. He recommended an aggressive physical therapy aimed at desensitization. Moore did attend physical therapy although she was reluctant to move any of the fingers on her right hand. During therapy she was started on a TENS unit. Dr. Bankston related the following scenario which occurred on her next visit:
On examination patient washad a very unusual response. She was breathing rapidly, rising in discomfort in the chair and, wouldheld her hand flexed in a flexed position and wouldn't move it at all. When I asked her to remove the TENS unit, which has some small sticky pads on it, she began breathing and panning (sic) very heavily as if to be in very intense pain from just removing these sticky pads from her hands.
On my examination of the hand, which was very difficult due to her rising in the chair, I could passively move the fingers through only about 20 degrees of motion before she fell on the floor in severe pain. I thought that the hand might have been a little bit swollen over the dorsal radial aspect of the hand, but there was no deformity, and I didn't really see anything else grossly wrong with the hand.
It was my impression at that time that she had a greatly exaggerated pain response. Still considering the diagnosis of RSD, therefore, I recommended some injections *482 or stellate ganglion blocks to see if this would relieve her symptoms.
In fact, those injections were done by Dr. Shoptaugh, an anesthesiologist. Moore underwent several injections and continued with physical therapy. She then advised Dr. Bankston that the injections did not relieve her pain. This nonresponsiveness to the injection treatment did not support the diagnosis of RSD. At that point Dr. Bankston felt "the patient was mostly exaggerating her symptoms and something was not correct in either her description of it or the way she was presenting, because it didn't make any sense." Dr. Bankston then referred Moore to a hand surgeon, Dr. Stokes. In conclusion, Dr. Bankston stated that he did not think she ever really had RSD, that surgery was contraindicated, her symptoms throughout the exam were totally out of proportion to any kind of injury she may have described and he suspected malingering.
Dr. Stokes examined Moore after carefully reviewing all records of Drs. Dunn and Bankston, including x-rays, bone scans, injection records, and the physical therapy reports. In his report, Dr. Stokes concluded in part:
This patient is complaining of severe hand pain on the right which appears to be totally out of proportion to the injury as described and certainly out of proportion to any of her clinical findings today, June 6th, 1994. In fact, on review of the history there is no clear cut history of injury. The patient was simply hanging a frozen bird and experienced a "bursting" sensation in her wrist and has been unable to return to work since. There are no clinical findings whatsoever of reflex sympathetic dystrophy. There are no clinical findings consistent with any significant injury to her hand or wrist. While the possibility of malingering has been raised, there are no findings that can support or refute this. I believe that there is strong psychological overlay in this patient. She is manifesting no sign whatsoever of any cumulative trauma disorder. There is no specific history of injury and I question the relationship of her job to her present complaints.
Moore, on her own, was seen by Dr. Riopelle, Director of the Pain Clinic. Dr. Riopelle only saw the patient one time and examined her without the benefit of the other doctors' reports, x-rays, bone scans or findings. He was made aware that the patient had been to physical therapy but had no records or reports before him. During the visit, Dr. Riopelle injected the patient with a nerve block which she stated aggravated the condition. Using another treatment he was able to produce some diminution in pain. In conclusion, the doctor stated in part:
I have not known this patient long enough to feel confident in stating her long-term prognosis. It (is) my impression, however, that she is experiencing pain in her right hand. If the hand surgeon who whom (sic) I sent her believes that an operative procedure on her hand is not warranted, then it is my plan to try to provide her with some relief through the use of anti-depressant medications (which are sometimes useful to chronic pain patients whether or not they are depressed). If this plan fails (as it not infrequently does), then I plan to try a TENS unit and to obtain her old records and learn which nerve blocks she has had. Blocks which I may try (provided that she agrees and that these blocks have not failed to provide relief in the past) include a stellate ganglion block and an axillary block.
The threshold prerequisite to the recovery of SEBs is that the employee's injury results in his inability to earn ninety percent or more of the wages he was earning at the time of the injury. Putman v. Commercial Union Ins. Co., 93-2263 (La.App. 1 Cir. 11/10/94), 645 So.2d 1250. When the claim for SEBs is based on disability and not substantial pain, the employee must prove the claim by a preponderance of the evidence. Lolan v. Louisiana Industries, 95-602 (La.App. 3 Cir. 11/2/95), 664 So.2d 616. To prove an issue by a preponderance of the evidence, the evidence, taken as a whole, must show that the fact sought to be proved is more probable than not. Shelton v. Wall, 614 So.2d 828 (La.App. 2 Cir.1993). The finding of disability in a workers' compensation case is a legal rather than a purely medical determination. Manson v. City of Shreveport, 577 So.2d 1167 (La.App. 2 Cir. 1991), writ denied, 580 So.2d 928 (La.1991). The determination that a claimant is disabled is made by reference to the totality of the evidence, including both lay and medical *483 testimony. Manson, 577 So.2d at 1170. The appropriate standard for appellate review is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's findings of fact unless those findings are clearly wrong in light of the record reviewed in its entirety. Rosell v. ESCO, 549 So.2d 840 (La.1989). The same standard of appellate review applicable to factual findings of district courts is also applicable to the factual findings of an administrative body or hearing officer. Alexander v. Pellerin Marble & Granite, 93-1698 (La. 1/14/94), 630 So.2d 706. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Further, even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where there exists a conflict in testimony. Stobart v. State, Dept. of Transp. and Dev., 617 So.2d 880 (La.1993).
The hearing officer relied most heavily on the findings of Dr. Riopelle and his conclusion that Moore is experiencing pain and that the patient could go back to work and perform any job compatible with her level of training and experience and not requiring use of her dominant (painful) hand. The hearing officer ruled that the report of Dr. Riopelle, claimant's chosen physician, showed the appellee was still in pain.[1]
Dr. Riopelle saw Moore only once and that was without the benefit of the other physicians' reports, test results or conclusions. In his report, he listed medical plans and procedures that he would try in the future if Moore continued to see him; these included a TENS unit, stellate ganglion block and an axillary block. Each of those procedures had previously been performed by other physicians with no findings of disability and the determination had been made by those physicians that the claimant could return to work with no restrictions. It is clear from his report that Dr. Riopelle would not have suggested those procedures if he had known that they had already been done.
The hearing officer also relied on Dr. Riopelle's opinion that Moore is experiencing pain and stated, "None of the other physicians could deny claimant was in pain." The only conclusion Dr. Riopelle made was that the claimant is experiencing pain. He did not conclude that the claimant was disabled because of her injury, he simply stated in a letter to the insurance company: "It is my opinion that this patient is able to go back to work and perform any job compatible with her level of training and experience and not requiring use of her dominant (painful) hand." Pursuant to LSA-R.S. 23:1221(3), an injured employee is entitled to SEBs if, by reason of the injury, the employee is unable to engage in any employment because of substantial pain. The circumstances necessary to support such an award must be established by clear and convincing proof, unaided by any presumption of disability. Anderson v. Biedenharn Bottling Group, 95-646 (La.App. 3 Cir. 11/2/95), 664 So.2d 588. The hearing officer's ruling was based on one physician's finding that the claimant is experiencing pain and the other physicians' failure to conclusively state the pain did not exist. We find that the claimant did not prove by clear and convincing evidence that she was in substantial pain.
In addition to the reports and deposition testimony of the physicians, the appellant presented a video tape for the hearing officer's consideration which showed a woman actively doing chores around her yard such as taking out the garbage and washing her car, both while using her right hand. The hearing officer rejected the video tape introduced by Sanderson Farms because Moore testified that the person in the video was not her, but was her fifteen year old daughter. As additional reasons to reject the video, the hearing officer stated that the private investigator who produced the video testified that he did not do a background check on the claimant, he was not given a photograph of her, he was just given a physical description. He stated that he did not know if anyone else in the claimant's household fit her description. The private investigator *484 did, however, testify that although he did not know Moore had a daughter he did follow Moore on another day and recognized her as the same woman in the video and that he recognized her in court as the female in the video. Since the private investigator positively identified Moore as the person in the video, and that person clearly had use of her right hand, it supports Drs. Dunn, Bankston and Stokes' opinion that Moore was not disabled and that she was not in substantial pain when using her right hand.
After a thorough review of the entire record and considering the totality of the evidence, we conclude that no reasonable factual basis existed for the hearing officer's determination that Moore was incapable of earning at least ninety percent of her pre-injury wages as a result of her January 2 and 26 accidents. We find the hearing officer was manifestly erroneous in that she based her finding of disability on Dr. Riopelle's report that suggested tests and procedures that had already been performed and which had resulted in findings of no disability by three other physicians. We further conclude that the record established the factual determination of the hearing officer on the issue of disability was manifestly erroneous. In light of the absence of preponderant proof by Moore that her hand injury rendered her partially disabled and unable to earn ninety percent of her pre-injury wages, and the absence of clear and convincing proof by Moore that substantial pain rendered her unable to perform any employment, her demand for SEBs must fail. As well, her claims for penalties and attorney's fees and continued medical treatment must fail.
Finally, Sanderson Farms asserts the hearing officer erred in finding Moore was deprived of an opportunity to seek treatment with a physician of her choice. Pursuant to LSA-R.S. 23:1121(B) a covered employee has the right to choose one physician in any field or specialty and the treatment will be paid for by the employer. After this selection is made, the employee must obtain the employer's consent to receive treatment from another physician in that same field or specialty, if that treatment is to be paid by the employer. Moore was originally treated by Dr. Dunn, and even though that doctor was chosen by her employer, she accepted his treatment and did not express dissatisfaction with his services until he released her to return to work. Dr. Bankston was also chosen by Sanderson Farms; Moore received treatment from him from February 24, 1994 until June 16, 1994. She attended physical therapy, as prescribed by Dr. Bankston, he performed diagnostic tests on her and he referred her to an anesthesiologist for the nerve blocks. Moore clearly submitted to treatment by Dr. Bankston. Further, she stated she never had a problem with Dr. Bankston. We find that Moore had de facto chosen Dr. Bankston as her treating physician. See Comeaux v. Sam Broussard Trucking, 94-1631 (La.App. 3 Cir. 5/31/95), 657 So.2d 449, and Guillotte v. Dynamic Offshore Contractors, 628 So.2d 234 (La.App. 3 Cir.1993).
For the forgoing reasons, the decision of the hearing officer is reversed and Moore's claim is dismissed with prejudice. Cynthia Moore is cast with all costs.
REVERSED.
NOTES
[1] Another physician's report was entered into evidence above the objections of defense counsel. We need not address whether or not the hearing officer was correct in that ruling since in her reasons for judgment she rejected the report and its conclusions.