626 So.2d 34 (1993)
Dr. Luther STEWART
v.
SELF-INSURER'S BUREAU.
No. 92 CA 1881.
Court of Appeal of Louisiana, First Circuit.
October 15, 1993.
*35 Robert Hill, Baton Rouge, for plaintiff-appellee Dr. Luther Stewart.
F. Scott Kaiser, Patricia Wilton, Baton Rouge, for defendant-appellant Self Insurer's Bureau.
Before CARTER, GONZALES and WHIPPLE, JJ.
CARTER, Judge.
This is an appeal from a judgment of the Office of Worker's Compensation in favor of a medical provider.

FACTS
On or about October 3, 1989, Lucy Mae Hammond, while in the course and scope of her employment with Fast Track U.S.A., Inc., allegedly suffered injuries in a slip and fall accident. Fast Track was self insured for workers' compensation claims at the time of the alleged incident, and its claims were administered through, defendant, Self Insurors Service Bureau, Inc.[1]
From October 3, 1989, to October 24, 1989, Ms. Hammond was seen by several physicians at Self Insurors' expense regarding her complaints of injury. However, on October 31, 1989, without notice to or prior approval from Self Insurors, Ms. Hammond consulted plaintiff, Dr. Luther Stewart, for evaluation and treatment. Ms. Hammond was seen by Dr. Stewart nineteen times between October 31 and December 8, 1989.
In March of 1990, Dr. Stewart forwarded to Self Insurors all bills for Ms. Hammond's treatment, totaling over $4,000.00. After reviewing the bills and Ms. Hammond's medical records, Self Insurors submitted the documents to Intracorp, an independent medical review firm, for an audit.
Dr. David Zelman, a physician who serves as an independent auditor for Intracorp, reviewed Dr. Stewart's bills and treatment records for Ms. Hammond. Based on Dr. Zelman's findings, Intracorp concluded that none of the treatment was "emergency treatment." Furthermore, Dr. Zelman determined that no more than $703.33 of Dr. Stewart's charges could be considered "reasonable and necessary" medical treatment.
Based on the audit report and the medical evidence, Self Insurors paid Dr. Stewart $703.33, but declined to pay the remainder of his charges. Dr. Stewart then filed a request for review of physician's fees for services and treatment with the Office of Worker's Compensation, seeking payment for the balance of his charges. Dr. Stewart claimed that Ms. Hammond's treatment was exclusively emergency treatment and that, therefore, the treatment was not subject to the statutory limit of $750.00, which is set forth in LSA-R.S. 23:1142.
On December 6, 1991, the matter proceeded to trial before a workers' compensation hearing officer who rendered judgment on April 30, 1992. The hearing officer determined *36 that Dr. Stewart's treatment was non-emergency treatment and that consent for treatment had not been obtained from Self Insurors. However, the hearing officer awarded Dr. Stewart the statutory limit of $750.00 for non-approved, non-emergency service, subject to a credit of $703.33 previously paid by Self Insurors, plus interest, costs, and $500.00 in attorney's fees.[2]
Self Insurors appealed from the judgment, contending that it was error for the trial court to award additional reimbursement of medical expenses and attorney's fees to Dr. Stewart.

REIMBURSEMENT FOR MEDICAL EXPENSES
Self Insurors contends that the trial court erred in awarding Dr. Stewart reimbursement beyond the $703.33, which Self Insurors had paid to Dr. Stewart.
LSA-R.S. 23:1203 A, provides that:
In every case coming under this Chapter, the employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal.... The obligation of the employer to furnish such care, services, treatment, drugs, and supplies, is limited to the reimbursement determined to be the mean of the usual and customary charges for such care, services, treatment, drugs, and supplies, as determined under the reimbursement schedule annually published pursuant to R.S. 23:1034.2 or the actual charge made for the service, whichever is less.[3] (Emphasis added).
LSA-R.S. 23:1142 C addresses emergency care and provides that no consent is required for an emergency procedure or treatment deemed immediately necessary by the treating health care provider. Any health care provider who authorizes or orders emergency diagnostic testing or treatment when diagnostic testing or treatment is not of an emergency nature shall be responsible for all charges incurred in the diagnostic testing or treatment. LSA-R.S. 23:1142 B addresses non-emergency care and provides as follows:
Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in nonemergency diagnostic testing or treatment without the mutual consent of the payor and the employee. Except as provided herein, that portion of the fees for nonemergency services of each health care provider in excess of seven hundred fifty dollars shall not be an enforceable obligation against the employee or the employer or the employer's worker's compensation insurer unless the employee and the payor have agreed upon the diagnostic testing or treatment by the health care provider.
The statute requires that Self Insurors be notified as to the treatment and charges for it to be responsible for compensation over $750.00, unless the treatment was of an emergency nature. See Anesthesia East v. CIGNA Insurance Company, 598 So.2d 1253, 1254 (La.App. 4th Cir.1992). In the instant case, it is undisputed that Self Insurors did not consent to and was not notified of Dr. Stewart's treatment of Ms. Hammond. Moreover, despite Dr. Stewart's contentions at the hearing that his treatment of Ms. Hammond was in the nature of emergency care, the hearing officer determined that the treatment was not emergency treatment.[4]
Under LSA-R.S. 23:1142, if the health care provider's services are found to be of a non-emergency nature, the provider cannot be reimbursed for more than $750.00 of the provider's total charges. The burden of proof is on the claimant or, as in this case, the health care provider to show by a preponderance of the evidence that the medical services were necessary and to show the *37 value of those services. See Anesthesia East v. CIGNA Insurance Company, 598 So.2d at 1254; Williamson v. CIGNA/Insurance Company of North America, 595 So.2d 325, 328 (La.App. 3rd Cir.), writ denied, 596 So.2d 197 (La.1992); Lynn v. Berg Mechanical, Inc., 582 So.2d 902, 912 (La.App. 2nd Cir. 1991).
In the instant case, the trial judge made the following determination:
While the undersigned is in agreement with the actions of the defendants in this situation, it is decided that the preponderance of the evidence demonstrates that they should have paid the full statutory amount of $750.00, which occasioned the need of filing this action to rectify the case.
Although the trial judge did not make an express finding that the services Dr. Stewart rendered were "necessary" medical expenses, implicit in the award of $750.00 in medical expenses is a determination that $750.00 of the expenses incurred were necessary. After reviewing the testimony and medical evidence in the record, we disagree.
On October 5, 1989, Dr. Frederick E. Hackley saw Ms. Hammond for complaints of back and neck pain. When he entered his office, Ms. Hammond was lying across the foot of the examining table, bent over with her feet on the floor. Dr. Hackley testified that Ms. Hammond was moaning as if she were in pain, but when he began questioning her, she stopped moaning. He also stated that when she was not aware that he was observing her neck movements, her range of motion appeared to be normal. He noticed, however, that when he requested that she move her neck through a range of motion, flexion, and extension, she had much more difficulty than she had when she was unaware of his observation. According to Dr. Hackley, the range of motion in Ms. Hammond's back was within normal limits.
Dr. Hackley found no abnormalities in his examination of Ms. Hammond. Dr. Hackley indicated that, based solely on Ms. Hammond's statement that she had been unconscious after the fall, he felt that she had sustained a concussion. He indicated that there was a probability that she was "overreacting to the injuries" because she was nervous. Dr. Hackley also indicated that Ms. Hammond's overreaction to her injuries may have been in an effort to malinger for some type of "secondary gain."[5] Dr. Hackley testified that he found nothing that would definitively diagnose an injury.
Dr. Hackley referred Ms. Hammond to Dr. Allen S. Joseph, a neurosurgeon, who saw Ms. Hammond on October 5, 1989. Upon examining her, Dr. Joseph found no abnormalities. Dr. Joseph later performed a CT scan and x-rays on Ms. Hammond, the results of which were normal. He then diagnosed Ms. Hammond with post traumatic stress disorder and, on October 16, 1989, recommended that she return to light work that excluded heavy lifting, bending, or stooping. Dr. Joseph stated that he felt that Ms. Hammond exhibited a very strong component of symptom magnification. He testified as follows:
There was nothing that I could detect, in seeing her two days after the accident with the multiplicity of complaints. It would be unusual for an individual to hurt that bad, this many spots, in one fall, short of something that you might expect in a major calamity, an earthquake or building falling on top of you or something. Then there ought to be measurable defects.
So I have a sense that ... there was more symptom magnification than there was a psychiatric disease as a consequence of trauma.
Dr. Joseph indicated that nothing in his examination or in any of the tests performed by him or, to his knowledge, by anyone else, produced any objective evidence of injury.
Ms. Hammond saw Dr. John F. Loupe, an orthopaedic surgeon, on October 24, 1989. Dr. Loupe examined Ms. Hammond and determined that the x-rays of her cervical and lumbar spine were normal. His impression was that Ms. Hammond had cervical and lumbar sprain. Dr. Loupe recommended a *38 back and neck care program and discontinued her medication. He indicated that Ms. Hammond's problems "should heal in about three weeks."
Dr. Joseph saw Ms. Hammond again on February 6, 1990. She complained of pain in both hips and in her tailbone. Dr. Joseph examined her, but found that everything was normal. Dr. Joseph stated that it was very hard to rely on Ms. Hammond's reports of pain because her symptom magnification was apparent. As a precautionary measure, Dr. Joseph ordered that additional testing be conducted. An MRI of the lumbar spine and an EMG provided normal results. Dr. Joseph then recommended that Ms. Hammond return to work without limitations because he felt that he had no further reasonable testing or treatment to offer Ms. Hammond at that time.
In March of 1990, Self Insurors received bills, totaling over $4,000.00, from plaintiff, Dr. Luther Stewart, for his treatment of Ms. Hammond. Because Self Insurors had not received notice of the treatment and had not approved such treatment, Self Insurors requested Ms. Hammond's treatment records from Dr. Stewart to enable them to consider payment. Dr. Stewart then forwarded the requested records to Self Insurors.
Dr. Stewart's records showed that, on October 31, 1989, Ms. Hammond consulted him for evaluation and treatment of back and neck pain. Ms. Hammond saw Dr. Stewart nineteen times between October 31 and December 8, 1989. Dr. Stewart's care of Ms. Hammond included the following nonexclusive methods of treatment: (1) TENS treatment, (2) hot packs, (3) massages, (4) ultrasound, (5) a myofascial injection, (6) I.M. injections, and (7) a thermogram.
After review of Dr. Stewart's bills and treatment, Self Insurors submitted the documents to Intracorp, an independent medical review firm, for an audit. Dr. David J. Zelman, a board certified rheumatologist and internist with extensive experience in the examination and treatment of back pain, neck pain, and chronic pain, who serves as a physician advisor for Intracorp, performed the audit of Dr. Stewart's charges and treatment records for Ms. Hammond. In his review of the bills and records, Dr. Zelman discovered a number of unreasonable, excessive, and/or medically unnecessary charges in Dr. Stewart's bills.[6] Dr. Zelman reported his findings to Intracorp, and based on these findings, Intracorp determined that only $703.33 of Dr. Stewart's charges were medically necessary, reasonable, and appropriate. Intracorp then issued an audit report to Self Insurors, and Dr. Stewart was paid $703.33.
On May 24, 1990, at the request of Ms. Hammond's attorney, Dr. Donald A. Dryer examined Ms. Hammond. Dr. Dryer opined that she had muscle strain in the cervical and lumbar areas. He stated that Ms. Hammond's only option, at that point, was to participate in a back hardening/pain management program.
On March 18, 1991, Dr. Thad S. Broussard examined Ms. Hammond at the request of the Office of Workers' Compensation. The examination revealed no objective findings. Dr. Broussard noted his suspicion that Ms. Hammond was exaggerating much of the pain for secondary gain purposes. He then indicated that no further orthopaedic intervention was necessary and that Ms. Hammond *39 should be returned to work without disability.
Dr. Stewart did not testify at the hearing nor did he call any witness to testify as to the necessity of the medical treatment administered to Ms. Hammond. After reviewing the testimony, the affidavits, the audit report, and the medical records, we find that the award of $750.00 for medical expenses is not supported by the record. The evidence in the record establishes that the "necessary" treatment of Ms. Hammond totaled $703.33. Dr. Stewart failed to satisfy his burden of proving the necessity of his medical services beyond the $703.33, which had already been paid by Self Insurors. Therefore, the hearing officer erred in awarding Dr. Stewart $750.00, subject to a credit for the amounts previously paid.

ATTORNEY'S FEES
Self Insurors contends that the trial court erred in awarding attorney's fees to Dr. Stewart.
Failure of a self-insured employer to pay any claim due under the Worker's Compensation Law within sixty days after receipt of written notice, when such failure is found arbitrary, capricious, or without probable cause, shall subject the employer to payment of reasonable attorney's fees. LSA-R.S. 23:1201.2; Dull v. Gibbs, 577 So.2d 806, 808 (La.App. 2nd Cir.1991); Robichaux v. Terrebonne Parish School Board, 426 So.2d 241, 245 (La.App. 1st Cir.1983). The statute is penal in nature and must be strictly construed. It should be utilized only in those instances in which the facts negate probable cause for non-payment. Robichaux v. Terrebonne Parish School Board, 426 So.2d at 245. To recover attorney's fees, it is the plaintiff's burden to prove by a preponderance of the evidence that the employer's conduct was arbitrary, capricious, and without probable cause. King v. Travelers Insurance Company, 553 So.2d 1072, 1073 (La.App. 3rd Cir. 1989), writ denied, 558 So.2d 570 (La.1990).
The Louisiana Worker's Compensation Law provides that an employer may reasonably controvert a disputed claim for medical benefits based on competent medical evidence. Martin v. H.B. Zachry Company, 424 So.2d 1002, 1008 (La.1982); Pollock v. Louisiana Insurance Guaranty Association, 587 So.2d 823, 830 (La.App. 3rd Cir.1991). It is not arbitrary and capricious to withhold payment of medical bills until such time as a proper breakdown of charges is received. Dubois v. Diamond M Company, 559 So.2d 777, 783 (La.App. 3rd Cir.), writ denied, 563 So.2d 866 (La.1990).
In the instant case, in awarding Dr. Stewart $500.00 in attorney's fees, the hearing officer apparently found that Self Insurors was arbitrary, capricious, or without probable cause in its failure to pay Dr. Stewart $750.00. The hearing officer stated as follows:
Counsel for the health provider argues that the failure of the defendants to promptly pay the full amount of the medical bill was arbitrary[,] capricious and without probable cause. The defendants contend that they reasonably controverted the bill and after putting the doctor's bill through an audit paid an amount which was considered usual and customary for the treatment given.
* * * * * *
While the undersigned is in agreement with the actions of the defendants in this situation, it is decided that the preponderance of the evidence demonstrates that they should have paid the full statutory amount of $750.00, which occasioned the need of filing this action to rectify the case....
Based on our finding that Dr. Stewart failed to prove that he was entitled to any additional medical expenses beyond what he had previously received from Self Insurors, we conclude that Self Insurors did not act arbitrarily, capriciously, or without probable cause in paying only $703.33 to Dr. Stewart. Upon receipt of the independent audit report, which found that $703.33 represented the amount of "necessary" medical services rendered by Dr. Stewart, Self Insurors promptly paid such amount. Accordingly, we find that the hearing officer erred in awarding Dr. Stewart $500.00 in attorney's fees.

*40 CONCLUSION

For the reasons set forth above, the judgment of the hearing officer, which awarded $750.00 in medical expenses, subject to a credit for the $703.33 previously paid, and attorney's fees of $500.00 and costs of $30.00 is reversed. Costs are assessed against Dr. Stewart.
REVERSED.
NOTES
[1] Plaintiff's petition incorrectly referred to defendant as Self-Insurer's Bureau.
[2] Self Insurors timely filed a motion for a new trial, claiming that Dr. Stewart was not entitled to attorney's fees. On May 27, 1992, the motion was denied.
[3] The statute specifically addresses an employer's obligation to provide necessary medical care to an employee who has been injured at work. However, the statute also applies to health care providers seeking reimbursement for treatment of the injured employee.
[4] Dr. Stewart did not appeal this determination.
[5] Dr. Hackley explained that "secondary gain" is medical terminology used when a person might expect to gain something from feigning an ailment "some attention, some monetary compensation, some disability, for instance."
[6] Dr. Zelman's affidavit sets forth the following information, which was revealed during his audit of Dr. Stewart's bills and treatment records for Ms. Hammond:

(1) that the Thermogram ordered by Dr. Stewart was medically unnecessary, inappropriate, and added nothing to the diagnosis or treatment of Ms. Hammond;
(2) that Dr. Stewart's billing for rental of the TENS unit as well as billing for TENS in the office was inappropriate and medically unnecessary;
(3) that numerous charges billed by Dr. Stewart were excessive or medically unnecessary, including IM injections of Benadryl and a charge of $150.00 for a myofascial injection, which typically costs from $30.00 to $50.00;
(4) that the number and duration of provision of passive modalities were in excess of what would be considered medically reasonable and necessary; and
(5) that none of the testing or services performed on Ms. Hammond by Dr. Stewart or his staff were "emergency medical treatment" as that phrase is customarily understood by the medical profession.