695 So.2d 1109 (1997)
Jerry A. McGAUGHEY
v.
CITY OF NEW ORLEANS.
No. 96-CA-1331.
Court of Appeal of Louisiana, Fourth Circuit.
May 28, 1997.
*1110 Avis Marie Russell, City Attorney, Scott P. Shea, Assistant City Attorney, New Orleans, for Defendant/Appellant.
Dale Edward Williams, Metairie, for Plaintiff/Appellee.
Before BYRNES, JONES and LANDRIEU, JJ.
JONES, Judge.
This is an appeal from a judgment rendered by a hearing officer for the Office of Worker's Compensation in favor of the plaintiff, Jerry A. McGaughey, a former firefighter for the City of New Orleans.

FACTS
On or about September 20, 1994, the claimant, a firefighter who had been employed by the City of New Orleans for approximately 23 years, filed a disputed claim for compensation with the Office of Workers' Compensation. Claimant alleged he was injured on July 31, 1993, while fighting a fire at Charity Hospital. He slipped in some water and injured his back while carrying 2 air tanks to the elevator. He eventually underwent a laminectomy because of the accident. On the disputed claim form, claimant indicated he was challenging the proposed termination of his worker's compensation benefits.
A hearing was held February 1, 1996, on claimant's disputed claim. At the hearing, it was stipulated that the City had been paying claimant the statutory maximum in weekly compensation benefits from the time of the accident up until the time of the hearing and all medical bills related to the back injury were being paid, including the surgery. The only contested unpaid medical bills were bills for psychiatric treatment claimant had received from Dr. George N. Guild.
The City denied compensation for psychiatric treatment, and alleged it was not aware claimant was seeing a psychiatrist. The City argued there was no prior authorization for psychiatric treatment. Further, the City denied claimant's psychiatric problems were caused by the job related accident.
Following the hearing on claimant's disputed claim, the hearing officer made the following findings of fact: 1) claimant proved his mental claim by clear and convincing evidence; *1111 2) the City of New Orleans' exposure for past medical benefits was limited to $750 under La. R.S. 23:1142; 3) future psychiatric treatment was authorized; and 4) the City was arbitrary and capricious for denying benefits and was liable for the payment of attorney fees in the amount of $5,000. The City appeals the judgment of the hearing officer. The claimant answered the appeal, requested review of portions of the judgment, and requested additional attorney fees.

DISCUSSION AND LAW
In the first assignment of error the City argues the trial court erred in finding claimant proved his mental injury by clear and convincing evidence as required by La. R.S. 23:1021(7).
Pursuant to La. R.S. 23:1021(7)(a) only injuries caused by "violence to the physical structure of the body and such disease or infections as naturally result therefrom" are compensable under the Workers' Compensation Act. Pursuant to La. R.S. 23:1021(7)(b) and (c) mental injuries caused by mental stress or physical injury to the employee's body cannot be considered a personal injury by accident arising out of and in the course of employment, and are not compensable, unless causation is demonstrated by clear and convincing evidence.
The test for determining what constitutes clear and convincing evidence was enunciated by this Court in Succession of Dowling, 93-1902 (La.App. 4 Cir. 2/25/94); 633 So.2d 846, wherein this court stated:
Proof by "clear and convincing" evidence requires more than a "preponderance of the evidence", the traditional measure of persuasion, but less than "beyond a reasonable doubt", the stringent criminal standard. Succession of Bartie, 472 So.2d 578 (La.1985); Succession of Lyons, supra [452 So.2d 1161 (La.1984)]. To prove a matter by "clear and convincing" evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence.

Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976).
Id. at 855.
The only testimony presented at the hearing concerning the causation of claimant's psychological problems was the testimony of claimant and the testimony of his treating psychiatrist, Dr. George N. Guild.
Claimant, Jerry McGaughey, testified he injured his back on the job when he slipped on some water while fighting a fire at Charity Hospital. The accident occurred the night of Friday, July 31, 1993. Claimant reported the injury that same evening to his supervisor and was taken for a drug test. That Monday morning, August 3, 1993, he called Dr. Robert Ruel's emergency number. Dr. Ruel told him to take Tylenol and later saw him in his office. It was discovered that he had some disk damage. Dr. Ruel initially prescribed heat treatment, analgesics and therapy, but claimant subsequently was forced to undergo surgery.
Claimant testified that while being treated by Dr. Ruel for his back injuries, he was experiencing severe back pain. The pain was so severe he began drinking that Monday morning after the accident. The morning he went to Methodist Hospital for help, he had a couple of shots of alcohol to help alleviate the pain as the medicine Dr. Ruel was giving him was not helping with the pain.[1] When he arrived at Methodist Hospital, he was seen by an assessment counselor and was told he needed to get into the alcohol and drug addiction program. He was in the program for approximately two weeks before he was finally able to see Dr. Guild in September of 1993. Dr. Guild commenced treating claimant for depression and continued to treat claimant up to the time of the worker's compensation hearing on February 1, 1996.
Claimant testified that prior to meeting with Dr. Guild he was not cognizant of the dangers of mixing drugs and alcohol. Dr. Guild prescribed medications and gave therapy. Because of Dr. Guild's intervention, claimant learned how to control his situation *1112 by being more relaxed. He saw Dr. Guild once a week and talked about coping skills for handling the pain in his back.
Dr. Guild, a licensed physician employed as the psychiatric consultant at the substance abuse program at Methodist Psychiatric Pavilion, testified concerning the cause and diagnosis of claimant's psychological problems. Dr. Guild was accepted as an expert in the field of psychiatric medicine. Dr. Guild was the first physician to evaluate claimant for his psychiatric problems. He testified claimant first saw him on Sept. 9, 1993, and at the time of his initial evaluation, Dr. Guild felt claimant was suffering with a major depression. Dr. Guild described the problems claimant experienced when he first saw him as follows:
Well, he had the classic symptoms of a biochemical or major depression, which had to do with loss of sleep, difficulty concentrating, confusion, inability to get thoughts together, social isolation, intense thoughts of suicide, dying, killing oneself, a loss of sexual interest, constant ruminative type of behavior.
When asked what the causative factors in claimant's case were, Dr. Guild replied:
In evaluating Mr. McGaughey, certainly he had a lot of psychological trauma. But I think that he had been subjected to that since early childhood. And the question is: Why is it all of a sudden this man becomes depressed and suicidal when I first saw him? This can be explained by the fact that chronic severe pain, such as the injury that he had to his back in this accident, causes a depletion of the neurotransmitters in the brain. Pain itself does that. This is well-documented, and this is one of the things that was gone over in this recent Yale Conference that I was at. But these things are well known in psychiatric circles.
In answer to specific questions concerning the consequences of the depletion of neurotransmitters in the brain and whether chronic pain, without more, was sufficient to produce symptoms of major depression, Dr. Guild responded:
Well, once these neurotransmitters begin to deplete, you begin to have classic symptoms of depression, confusion, acting out type behavior, things that a person normally would not do, feelings of profound hopelessness, worthlessness, people start doing things they would ordinarily not do because of this. It is a biochemical problem.
After hearing all the evidence, the hearing officer found that claimant met the burden of proving that the initial physical injury of July 31, 1993, caused his psychological injury. In making this finding, the hearing officer, in her reasons for judgment stated:
The initial back injury of July 31, 1993 was admittedly within the course and scope of employment. The testimony of claimant and Dr. Guild, claimant's treating psychiatrist, was that the chronic pain of the initial injury of July 31, 1993 was a cause of the major depression for which claimant needs psychiatric treatment. There were other problems in claimant's life at the same time as the accident that certainly must have had a detrimental psychological impact on claimant; namely, his arrest. However, Dr. Guild testified that claimant's "major depression" was due to a chemical/biological change caused by chronic pain from the back injury of July 1993. (This court does not require that the physical injury be the sole cause; however, this was the testimony of Dr. Guild.) This testimony was not countered by any witness for the defendant. (emphasis added)
The standard of review for findings of fact in a workers' compensation case is that of manifest error. Doucet v. Baker Hughes Production Tools, 93-3087 (La.3/11/94); 635 So.2d 166.
Having reviewed the entire record, we do not find the hearing officer committed manifest error in finding claimant proved his psychiatric treatment was causally related to the initial injury of July 31, 1993, which was admitted to be within the course and scope of employment.
Notwithstanding its failure to present any rebuttal testimony, the City argues that because of the "myriad of unrelated problems going on in Mr. McGaughey's life, proving *1113 that his mental disorder is related to his accident [is] virtually impossible." While it is true that claimant's ongoing problems certainly made it more difficult to prove his case, the nature of the shifting burdens of proof and the lack of any conflicting medical evidence on causation made it easier for claimant to ultimately prevail.
The court in Pitre v. Oilfield Production Contractors, 94-961 (La.App. 3 Cir. 3/8/95); 651 So.2d 980 detailed the shifting burden of proof in a worker's compensation case when it stated:
An employee in a worker's compensation action has the burden of establishing a causal link between the accident and the subsequent disabling condition. Walton v. Normandy Village Homes Ass'n, 475 So.2d 320 (La.1985) .... Where, as in the case sub judice, the employee suffered from a pre-existing medical condition, he may nonetheless prevail if he proves that the accident "aggravated, accelerated, or combined with the disease or infirmity to produce ... disability for which compensation is claimed." Walton, supra, at 324 (citations omitted). In Walton, supra, the Louisiana Supreme Court recognized the existence of a presumption to aid plaintiffs in cases involving a pre-existing condition. It stated:
[W]hen an employee proves that before the accident he had not manifested disabling symptoms, but that commencing with the accident the disabling symptoms appeared and manifested themselves thereafter, and that there is either medical or circumstantial evidence indicating a reasonable possibility of causal connection between the accident and the activation of the disabling condition, the employee's work injury is presumed to have aggravated, accelerated or combined with his preexisting disease or infirmity to produce his disability. Id. at 324-25 (citing Hammond v. Fidelity & Cas. Co., 419 So.2d 829 (La.1982); Haughton v. Fireman's Fund American Ins. Co., 355 So.2d 927 (La. 1978)).

Once the employee has established the presumption of causation, the opposing party bears the burden of producing evidence and persuading the trier of fact that it is more probable than not that the work injury did not accelerate, aggravate or combine with the pre-existing disease or infirmity to produce his disability. Peveto v. WHC Contractors, 93-1402 (La.1/14/94); 630 So.2d 689. Furthermore, medical testimony, albeit significant, is not conclusive as to the issue of causation, which is generally the ultimate fact to be decided by the hearing officer after weighing all the evidence. Id. (emphasis added).
Id. at 982-983.
In the case sub judice, claimant clearly had problems prior to the on the job accident. Claimant admitted to having the alcohol problem since early childhood, or at least since the time of his service in Vietnam. Claimant also admitted he was arrested on criminal charges August 4 or 6 of 1993 (some weeks after the accident) and he pled guilty to a felony, "contributing to the delinquency of a minor." He was placed on active probation for two years, with the promise that a "nolo contendre" (sic) would be entered at the end of the year, and the felony would be wiped off his record. A stipulation to his plea-bargain is that he is to go to AA meetings and get some consultation. Claimant also admitted to being separated from his wife for two and one half years. However, he testified he saw Dr. Guild because of depression related to losing his job.
Dr. Guild admitted alcohol is a depressant and alcohol depletes neurotransmitters. He also admitted marital problems can cause depression, but termed those psychological depressions as "not major." He further admitted he was aware of the other stressful events in claimant's life which could cause depression, but he testified that in his opinion the chronic back pain from the accident was a causative factor for the major depression claimant was suffering. In this regard he thought it significant that up until the time of the job related accident, claimant "was maintaining."
When asked if the presence of chronic pain alone was sufficient to produce symptoms of major depression, Dr. Guild replied:

*1114 That's right. You can take anyone and subject them to severe chronic pain and they will begin to develop these symptoms.
Given the fact that claimant had been on the job for over twenty years and had obviously been performing satisfactorily up until the time of the accident, Dr. Guild's testimony was clearly enough to create a presumption of causation. Thus, the next question to be answered is what evidence did the City present to meet its burden of producing evidence and persuading the trier of fact that it is more probable than not that the work injury did not accelerate, aggravate or combine with the pre-existing disease or infirmity to produce his disability. The answer is "none."
The City presented no evidence to rebut Dr. Guild's testimony concerning causation. Yet, the City argues that the facts of this case are similar to Pitre v. Oilfield Production Contractors, supra, and Fuselier v. International Maintenance Corp., 94-792 (La. App. 3 Cir. 2/1/95); 649 So.2d 1197, wherein the court affirmed judgments denying claimants compensation for alleged mental injuries. We disagree. Both cases are clearly distinguishable from the case sub judice.
The facts of this case differ from Pitre v. Oilfield Production Contractors, supra, wherein the court denied claimant's mental claim finding that he failed to carry his burden of proof. The claimant in Pitre had pre-existing psychiatric problems including drug abuse, suicidal thoughts and alcoholism, and had been hospitalized on numerous occasions. The court, noting the extensive documentation of Mr. Pitre's psychological and substance abuse problems both before and after the job related incident concluded, "... it is ridiculous to suggest that the incident was anything more than one small and noncontributing event over a course of years of problems."
It is significant to note that in Pitre, claimant suffered psychological and emotional problems both before and after the job related physical injury and had been hospitalized at least five times for alcohol abuse prior to the date of job related physical injury. However, in the case sub judice, there was no testimony or evidence of any prior hospitalizations for alcohol abuse or for any other mental type problems. Additionally, although the claimant in Pitre alleged the job related accident rendered him mentally incapable of returning to work, a psychiatrist providing an independent psychological evaluation opined that the psychological problems claimant suffered from did not stem from the job related accident, but rather said problems were a continuation of past health problems, poor coping skills, and a prior injury. In the case sub judice, there is no history of any prior hospitalizations of claimant for psychological problems prior to the work related physical job injury. Indeed, claimant testified that prior to the accident, he had never sought psychiatric help. More importantly, there is absolutely no evidence in the record to contradict the testimony of claimant's psychiatrist that the psychological problem was caused by a depletion of neurotransmitters, and that back pain claimant suffered because of the job related physical injury was indeed a causative factor of claimant's psychological problem. Unlike the claimant in Pitre, the defendant employer did not request an independent psychological evaluation, nor did the employer call any witnesses to rebut the testimony of claimant and the medical expert. Instead, the employer, through its attorney, merely offered an argument that claimant failed to prove his case by clear and convincing evidence.
Nor do we find this case to be governed by Fuselier v. International Maintenance, supra. In Fuselier, the hearing officer was faced with the problem of resolving credibility questions raised by conflicting medical testimony. One psychiatrist who examined claimant had concluded claimant had severe psychological problems that stemmed from his overreaction to the chronic back pain caused by the work related injury to his back. Another psychiatrist who examined claimant at the request of the defendant concluded that claimant's psychological problems did not result from the work-related injury. The hearing officer accepted the conclusion of the defendant's psychiatrist. The reviewing court affirmed the decision of the hearing officer. Recognizing that a reviewing *1115 court cannot set aside a hearing officer's finding of fact in the absence of manifest error, the court refused to disturb the findings of the hearing officer. In doing so, the court noted where there was a conflict in testimony, reasonable evaluations of credibility and reasonable inference of fact would not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
In the instant case, there is no conflicting testimony. Rather, the testimony merely conflicts with the conclusion the City wishes to have this Court draw from what it points up as the weaknesses in the evidence. If the City had produced even one credible witness to support a finding that Dr. Guild was not a credible witness or if the hearing officer, on her own chose not to believe Dr. Guild, the argument that the hearing officer committed manifest error might have merit. But the City failed to produce any witnesses to support a finding that the claimant's physical injury did not cause or contribute to claimant's mental problems, and the hearing officer found Dr. Guild and claimant to be credible witnesses. In the absence of contradictory medical testimony, we cannot say the hearing officer committed manifest error in finding the claimant met his burden of proving his case by clear and convincing evidence.
In its second assignment of error, the City argues the trial court erred in finding the City to be arbitrary and capricious for denying payment for psychiatric treatments. We agree.
During the pendency of claimant's claim La. R.S. 23:1201(E) provided for penalties when benefits were not timely paid, unless the entitlement to benefits was "reasonably controverted" by the employer. Additionally, La. R.S. 23:1201.2 authorized attorney's fees when the non-payment or discontinuance of benefits was found to be "arbitrary and capricious." These sections of the statute are penal in nature and must be strictly construed. Comeaux v. Sam Broussard Trucking, 94-1631 (La.App. 3 Cir. 5/31/95); 657 So.2d 449, 455. An employer should not be penalized for taking close factual or legal questions to court for resolution. Lindon v. Terminix Services, Inc., 617 So.2d 1251 (La.App. 3 Cir.), writ denied, 624 So.2d 1226 (La.1993); and Dupont v. Ebasco Services, Inc., 411 So.2d 605 (La.App. 4th Cir.1982).
In determining the City was arbitrary and capricious for denying payment for psychiatric treatments the hearing officer apparently based her finding on the City's alleged failure to investigate claimant's claim that his psychiatric treatment was compensable. In the reasons for judgment the hearing officer stated:
"It is undisputed that defendant never investigated the claim of psychiatric compensability to this claimant. The defendant relies solely on no authorization for treatment and that it was not an emergency situation. However, the statutory amount of $750.00 was never paid as defendant contended that the mental injury was not related to the back injury. This was the opinion of defendant's adjustor from Rosenbush. Furthermore, the claim was never investigated as to its compensability.
Defendant's position is that claimant did not ask us before treatment began, therefore we do not have to ever investigate the claim. At some point in time during litigation and after notice, this becomes a ludicrous position and defendant had a duty to investigate claimant's contention that his mental injury was related to the initial back injury. This the defendant failed to ever do and for that it was arbitrary and capricious. For this action, defendant owes attorney fees to claimant of $5,000.00." (emphasis added)
An employer clearly has a duty to investigate a claim prior to denying compensation. See Allen v. Misco Paper, 27,146 (La.App. 2 Cir. 8/23/95); 660 So.2d 175 and Bundren v. Affiliated Nursing Homes, Inc., 94-808 (La. App. 3 Cir. 2/1/95); 649 So.2d 1177.
The questions to be addressed in this assignment of error are 1) when did the duty to investigate begin and 2) what constituted sufficient investigation prior to denying compensation for a claim of mental injury.
*1116 Although the hearing officer opined that at some point defendant had a duty to investigate claimant's contention that his mental injury was related to the initial back injury, the hearing officer fails to state at what point this defendant should have investigated claimant's claim of mental injury. However, at a minimum it is obvious investigation of a claim cannot begin until such time as the defendant is placed on notice that a claim for compensation is being made.
In reviewing the entire record, we are hard pressed to determine when defendant was placed on notice. However, it is undisputed that defendant had no knowledge that claimant was being treated by Dr. Guild prior to the time the insurer received an initial evaluation report prepared by Comprehensive Rehabilitation Associates, Inc. In that report, dated November 2, 1994, Angelle W. Nash, a rehabilitation specialist, and Vicky Hamann, a rehabilitation supervisor, gave a report to Rosenbush, the defendant's insurer. The report was sent to the attention of Kathy Clement, and gave claimant's diagnosis as "post-lumbar discectomy." The report primarily focuses on claimant's back injury, and contains the following oblique reference to claimant's treatment with Dr. Guild:
Additionally, Mr. McGaughey advised that he is currently seeing Dr. Guild, a psychiatrist, in New Orleans. Mr. McGaughey advised that Dr. Guild has previously treated him for alcoholism and family therapy. He advised that currently Dr. Guild is focusing on additional treatment concerns as Mr. McGaughey is affected by the fact that he will not be able to return to work as the employer does not offer light duty and he is unable to perform his previous position. He advised that the loss of his job has affected him and he is additionally upset about losing his status as he has only two years until he may take full retirement.
At this time, Mr. McGaughey reports that he is not taking any medications. However, he did list a number of medications prescribed by Dr. Guild that he is not taking at the present time but does take occasionally as needed. Most of these medications are anti-anxiety agents including: Wellbutrin, Serentel, Trazodone and an anti-inflammatory, Naprosyn.
The above quoted paragraphs certainly did not place the defendant on notice that claimant was alleging a causal connection between the on the job injury and his psychiatric problems. Indeed, the logical inference to be drawn from the language in the report was that claimant had been seeing Dr. Guild for alcoholism and family therapy. There is no reference to the pain from the accident causing depression.
Further, claimant's initial notice of disputed claim form filed 9/20/94 says absolutely nothing about disputed psychiatric treatment. The sole basis of dispute given is, "Kathy Clement of the N.O. Rosenbush Claims told claimant that his workman's comp. would stop for his pension." In the claim data form attached, he further stated, "The department is beginning his pension on November 9, 1994. Kathy Clement from the New Orleans Rosenbush Claims told Claimant his workman's comp. (sic) would stop. He wants his workman's comp. (sic) and his rightly deserved pension. He has 23 years with the fire department and is only 2 years away from retirement." The disputed claim form was signed by claimant and forwarded to the Office of Worker's Compensation by claimant's attorney. Significantly, the only type of injury listed is claimant's back injury. When asked to name the physicians who had treated him for his injury, claimant only listed Dr. Ruel, the physician who treated him for his back injury. If claimant was aware of the causal connection between his back injury and his major depression, it would appear he would have mentioned it. However, he failed to list any type of mental injury, and it is obvious the defendant had no duty to investigate at that point.
We further note that although claimant's bills for treatment of his back ailment were promptly submitted to the City's worker's compensation carrier for payment, the bills for claimant's psychiatric bills were not submitted to the City until almost two years after claimant commenced treatment. The lengthy delay in submitting medical bills for claimant's psychiatric treatment raises serious issues as to when claimant and/or his *1117 treating physician realized the on the job physical injury was a causative factor in claimant's allegedly resultant mental injury.
An adequate explanation for the delay in submitting the bills was never given. However, claimant testified he initially went to Methodist Hospital on his own initiative because this was a hospital listed on his insurance plan. Claimant admittedly did not initially tell the City's insurer he felt he was in need of psychiatric treatment because of the accident. Rather, he simply called and told a representative for the insurer he was in severe pain and needed help. Since the insurer already knew he was seeing Dr. Ruel, claimant assumed she realized he meant he needed to see someone other than Dr. Ruel to get some additional help. Claimant admitted he did not specify he needed a psychiatrist. According to claimant, he was told to submit something in writing, but he informed the representative this would take too long because he was in pain. He informed the representative from the City's insurer he was going to see his own doctor "right now."
Even more instructive is the manner in which the billing for claimant's psychiatric care was handled. Claimant testified that the billing staff for Methodist told him at first that since he had come in on his own, 50 percent of the charges were covered under his hospitalization. Wherein, claimant informed the billing personnel he did not know if the illness was "related or not." Claimant also admitted he did not know if Methodist Psychiatric attempted to get authorization from the worker's compensation adjuster. Dr. Guild testified he had nothing to do with billing; he handed billing matters over to Jennifer Conner, the person who handles his billing. Jennifer Conner identified a correspondence dated 8/8/95 from Rosenbush, the City's insurer, as a letter received in 1995 informing Dr. Guild that there was no authorization for claimant's visits to Dr. Guild, and requesting that "the bills be filed with his insurance carrier." Jennifer Conner could not recall the date she filed the bills with Rosenbush which prompted the 8/8/95 reply, and she admitted she did not talk to anybody at Rosenbush on the telephone. All she remembered was that it was in 1995, and at that time she filed the current bills before attempting to file the older ones. She had been working for Dr. Guild in the capacity of handling billing and insurance for about a year as of 2-1-96, the date of the hearing. This was the first time she sent anything to Rosenbush for Dr. Guild. Ms. Conner testified claimant's insurance health plan carrier paid fifty per cent on some of the 1995 claims. Ms. Conner admitted she submitted some of the older bills to his insurance carrier, but was told they were too old and the insurance company would not pay anything on them.
Linda Blount, an adjuster for Rosenbush, testified she was the claims adjuster currently assigned to handle claimant's case. She had no record in file that Rosenbush was ever contacted by Mr. McGaughey or by Dr. Guild concerning psychiatric treatment. The file contained no notation anywhere that claimant requested authorization to see a psychiatrist. She admitted receiving a bill giving a date of service of 7-28-95 from Dr. Guild's office. To the best of her recollection that was the first bill she'd ever received. If she had received a medical report, she would have copied that also. However, the file contained no notations concerning any medical reports received from Dr. Guild. The file contained the report from the rehabilitation people dated 11-2-94 wherein claimant advised that Dr. Guild had previously treated him for "alcoholism and family therapy." The only contact with Dr. Guild's office was in August of 1995.
Clearly, the City's insurer was not contacted by Dr. Guild's office until sometime near August of 1995 when a bill was sent. The file contains no testimony or explanation of what prompted Dr. Guild's office to send the bills at that time.
We find nothing in the record to assist us in pinpointing the exact date the City was actually placed on notice that claimant was contending his psychiatric problems were causally connected to his job related accident. Indeed, the hearing officer admitted the exact date of notification was unknown. The remarks made by the hearing officer in her reasons for judgment indicate uncertainty as to when, if ever, notification occurred. In *1118 giving reasons for assessing penalties, she stated:
"When, if ever, did defendant become aware that claimant contended that his psychiatric problems were causally related to the injury of July 31, 1993?"
It appears to this court (sic) that defendant was not on notice of this claim until after the mediation process, which was after the filing of claimant's form 1008 with the OWC. The exact date is not known.

However, the sole notice came from claimant himself and not from any medical reports submitted by claimant to defendant.
Nonetheless, "When, if ever, did defendant have a duty to investigate whether or not the claim of psychiatric compensability was compensable under the compensation act?"
Although the hearing officer opined defendant was not on notice until after the mediation process, we find no documents in the record to establish the exact date of notice. According to the minutes of the worker's compensation proceedings, a mediation conference was set for 12-01-94 at 2:30 p.m. However, there are no written documents in file detailing what was discussed at that conference.[2] Nor does the file contain a form 1008 placing the City on notice that a dispute exists concerning payment of psychiatric bills. There are no pre-trial memorandums, contentions of fact, etc. The very first mention of disputed psychiatric bills is at the beginning of the hearing wherein the parties stipulate that all weekly benefits and all medical bills related to claimant's back have been paid, and the only disputed claim is the claim for unpaid psychiatric bills.
There is no evidence in the record to substantiate a finding that the City was arbitrary and capricious in denying compensation for claimant's psychiatric treatment where the City was never provided with the necessary notice or medical evidence to show a connection between the alleged mental injury and the on the job physical injury. The City timely paid all medical bills related to the back injury and paid claimant the required weekly benefit. The City apparently provided rehabilitation services as well. The City was initially unaware of the fact claimant was alleging a mental injury or that he had commenced treatment for a mental injury. More importantly, once the City was placed on notice, enough conflicting data existed in the records from which the City could reasonably determine that the decision concerning the credibility and sufficiency of the evidence of causation would best be left to a hearing officer.
The burden of establishing causation for a mental injury by clear and convincing evidence was on the claimant, not the City. To find an arbitrary and capricious failure to pay under these circumstances basically requires a finding that the City should have been able to accurately predict the Hearing Officer would find Dr. Guild to be a credible witness and that Dr. Guild would be able to establish claimant's mental injury was caused by his physical injury by clear and convincing evidence. This was not the intent of La. R.S. 23:1201.
In reviewing the evidence, this Court is also of the opinion that it was only at the hearing that claimant produced testimony which could be considered clear and convincing evidence of causation. The only medical report in the record is Dr. Guild's psychiatric report dated November 6, 1995. That report is very general. Diagnostic impressions given in the report are "Major Depressive Disorder" and/or "Generalized Anxiety Disorder." Significantly, the report does not give depletion of neurotransmitters as a result of chronic back pain as the causation for claimant's illness. In fact, the only reference to any relationship with the job contained in the report is the following brief paragraph contained in the summary:
It is quite apparent how seriously depressed and anxious Mr. McGaughey is. (A unique feature of a depressive reaction is that it is attributable to some experience, i.e., injury to his back.) He is extremely *1119 upset over the loss of his physical health, his financial security, and his self-esteem. Mr. McGaughey is in severe emotional stress and turmoil, and the result of this struggle is a person who now has a very poor self-image and who has expectations of disappointment for the future. Impulsivity (sic) has been a problem for Mr. McGaughey since his accident ...
There is no evidence in the record to establish the employer ever saw this report prior to trial. At trial, Dr. Guild identified the report as one he prepared on November 6, 1995, but neither he nor any other witness testified the report was ever sent to the employer or the employer's insurer. More importantly, even assuming it had been sent to the employer, it was not until the date of trial that Dr. Guild provided the additional information concerning the depletion of neurotransmitters that we find the claimant adequately articulated the necessary connection between the pain caused by the physical injury to his back and his mental injury. In this respect, this case differs substantially from cases such as Allen v. Misco Paper, supra, and Bundren v. Affiliated Nursing Homes, Inc., supra, wherein penalties have been assessed. In those cases, the employers had been placed on notice of claimant's claim and/or had received some type of medical reports substantiating the claim in some manner.
In Allen v. Misco Paper the employer had an accident report indicating that claimant's hand was injured immediately after the accident. Yet the insurer did not take a recorded or written statement from any witnesses in the workplace who may have witnessed the accident. Additionally in that case the court concluded, after reviewing all the evidence, that the defendants' factual and medical information was based on slovenly and/or biased investigation of the claim. The court found the defendants seized the report of one physician as a means to deny compensation and made little or no good faith effort to look further. Additionally there was evidence in that case that the insurer had stated early on its intent to "make a stand and withhold payment." The court concluded further investigation was warranted, particularly in light of the contradictory medical information. Additional investigation would have revealed that the claimant repeatedly complained of hurting his hand from the time he got up from the floor after the accident and that the unfavorable report from the physician relied upon was less than accurate. The court concluded in that case that the WCHO was manifestly erroneous in denying penalties and attorney's fees to the claimant where "[t]he tenor of the strong facts and evidence of causation make the defendants' refusal to pay compensation arbitrary, capricious and without probable cause."
Similarly in Bundren v. Affiliated Nursing Homes, Inc., supra, the court affirmed an award of attorney's fees where the hearing officer found the defendant produced no evidence to sufficiently controvert claimant's need for psychological treatment. The court noted:
A workers' compensation claimant will be entitled to attorney's fees if the employer acts arbitrarily and capriciously in refusing to pay for necessary medical services. See Menard v. Multi-Service Corp., 546 So.2d 952 (La.App. 3 Cir.1989). A hearing officer has great discretion in the award of attorney's fees, and his or her decision will not be disturbed by an appellate court unless it is clearly wrong. Dietz v. Guichard Drilling Co., 626 So.2d 79 (La.App. 3 Cir.1993).
Id. at 1180.
In Bundren v. Affiliated Nursing Homes, Inc., the defendant notified claimant it would not pay for psychological evaluation because the "medical necessity of the services has not been documented." However, the next day, the treating physician sent a letter to the workers' compensation adjuster for the defendant, advising her claimant had been under his care for cervical spine pain following a job related injury; that claimant suffered nervousness and fear related to his pain; and claimant was anxious and disturbed following his accident. For that reason, the treating physician advised the adjuster that he had suggested claimant undergo neuropsychological evaluation and intervention with a psychologist.
*1120 The court in Bundren v. Affiliated Nursing Homes, Inc. opined that "at that point, at the least, the defendant had a duty to investigate further whether payment for Mr. Bundren's psychological evaluation was warranted." Notwithstanding the fact that they had all the medical records from claimant's doctors, claimant's benefits were terminated. Finding that the medical records should have clearly informed the defendant that the treating physician felt claimant needed psychological treatment and that the psychologist felt claimant's anxiety was directly related to the work accident, the court agreed the refusal to pay for treatment was arbitrary. Finding that defendant should have conducted this investigation earlier, the court held the hearing officer was not clearly wrong in awarding attorney's fees.
Having reviewed the evidence presented at the hearing, this Court is convinced that the issue of whether the claimant's mental injury was caused by his physical injury was a close issue which could have been decided either way, based upon whether the hearing officer found claimant and/or Dr. Guild to be credible witnesses. Given the other stressful events that coincided with the time of the accident, the hearing officer could just as easily have decided that causation was not proved, particularly if the City had presented testimony from a medical authority to support such a finding. Indeed, the hearing officer had the option of finding the medical testimony presented was not sufficient to prove the claimant's case by clear and convincing evidence.
At the time of the hearing on February 1, 1996, the City had paid all medical payments related to the back injury which the claimant suffered in the accident. However, the City had not paid the psychiatric bills. The City gave two reasons for its failure to pay the psychiatric bills. First, it was undisputed that the psychiatric bills of claimant had not been submitted to the City prior to 1995. The date of Dr. Guild's psychiatric report was 11/6/95. Second, the City maintained the claimant's psychiatric problems did not stem from the accident, but rather preexisted the accident and/or were caused by other conditions that existed in the claimant's life.
Claimant admitted in his testimony that he had been experiencing problems with alcoholism probably since early childhood, or at least since his days in Vietnam. Further, at a time extremely close to the date of his accident, he had been arrested and charged with the crime of contributing to the delinquency of a minor. Because of this situation, the City maintained claimant did not meet his burden of proving by clear and convincing evidence that his mental disability was proximately caused by the accident. The City clearly acted reasonably in handling claimant's claims. For these reasons, we find the Hearing Officer clearly erred in finding the City was arbitrary and capricious in failing to pay for claimant's psychiatric treatment.
In claimant's first assignment of error, claimant argues the hearing officer erred in finding he had not carried his burden of proving that his psychiatric treatment was emergency in nature. Thus, according to claimant, he is entitled to have his psychiatric medical bills and expenses paid in full. We disagree.
La. R.S. 23:1142 provides, in relevant part, as follows:
B. Nonemergency care. Except as provided herein, each health care provider may not incur more than a total of seven hundred fifty dollars in nonemergency diagnostic testing or treatment without the mutual consent of the payor and the employee as provided by regulation....
* * * * * *
D. Fees and expenses. If the payor has not consented to the employee's request to incur more than a total of seven hundred fifty dollars for any and all nonemergency diagnostic testing or treatment when such consent is required by this Section, and it is determined by a court having jurisdiction that the withholding of such consent was arbitrary and capricious, or without probable cause, the employer or the insurer shall be liable to the employee for reasonable attorney fees related to this dispute and for any medical expense so incurred by him for an aggravation of the employee's condition resulting from the *1121 withholding of such health care provider services.
E. Exception. In the event that the payor has denied that the employee's injury is compensable under this Chapter, then no approval from the payor is required prior to the provision of any diagnostic testing or treatment for that injury.
The validity of the provisions of § 1142 have been upheld in numerous cases. See Anesthesia East v. CIGNA Ins. Co., 598 So.2d 1253 (La.App. 4th Cir.1992); Stewart v. Self-Insurer's Bureau, 626 So.2d 34 (La.App. 1st Cir.1993).
The hearing officer made the following finding of fact concerning whether claimant proved his psychiatric treatment was of an emergency nature:
Claimant did not prove that the psychiatric treatment was of an emergency situation. He called Rosenbush, the adjusting company for defendant, but did not specifically state that he needed psychiatric treatment. His treating psychiatrist did not clarify that it was an emergency situation; he did testify that claimant was "suicidal" but this court does not necessarily interpret that to mean that there was such an emergency situation that medical authorization could not have been obtained. It simply was not attempted nor was it ever attempted.
Claimant presented no evidence to establish that the psychiatric treatment was of an emergency nature. We agree with the hearing officer's finding of fact that claimant did not prove his psychiatric treatment was of an emergency situation. For this reason, the hearing officer did not err in finding that the City only had to pay $750 for past psychiatric treatment.
Claimant also argues he is entitled to additional attorneys fees for answering the appeal. Having found that the City was not capricious and arbitrary in failing to make the payments and that the issue of whether claimant met his burden of proof was a close issue, it is obvious the appeal is not frivolous. Accordingly, the judgment of the hearing officer is affirmed insofar as it held claimant met the burden of proving causation and insofar as it held that pursuant to La. R.S. 23:1142 the City is not liable for payment of past psychiatric bills in excess of $750. That portion of the judgment assessing penalties and attorneys fees against the City is reversed. Appellee's request for additional penalties is denied. Each party is to pay his own costs for this appeal.
AFFIRMED IN PART AND REVERSED IN PART REQUEST FOR ADDITIONAL PENALTIES DENIED.
NOTES
[1] Plaintiff could not remember the exact date the pain became so severe that he sought help at Methodist Hospital. However, it was after Dr. Ruel had started treating him, and prior to September 9, 1993, the date he first saw Dr. Guild.
[2] A minute entry dated 12-01-94 merely states, "Waiver of Citation and Acceptance of Service signed by defendant."